## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

**HPIL HOLDING, INC.** a Wyoming

     Plaintiff,

v.

**HAINING ZHANG** a/k/a **HARRY ZHANG** a/k/a
**HARRY HAINING ZHANG**
**ANGELA COLLETTE**, **ANDREW BADGER**,
**MARK OSBORNE, DAVID POSTULA, DARCY**
**CHRISTOPHERSON**, **CRANK MEDIA, INC.**,
a Nevada Corporation, **BROWN FAMILY**
**INVESTMENTS, LTD**, a British Columbia
corporation, and **CRITERIA MANAGEMENT, LTD**,
a British Columbia corporation.

     Defendants.

Case No. 1:23-cv-12050-TLL-PTM
Honorable Thomas L. Ludington
Magistrate Patricia T. Morris

<u>JURY DEMAND</u>

_____/

Daniel J. Lehman (P66126)
The Law Offices of Daniel J. Lehman, PLLC
Attorneys for Plaintiff
32000 Northwestern Highway, Suite 128
Farmington Hills, MI 48334
(248) 882-3906
dan@djlehmanlaw.com
_____/

## <u>PLAINTIFF HPIL HOLDING'S FIRST AMENDED COMPLAINT</u>

NOW COMES Plaintiff, HPIL Holding, Inc. ("HPIL"), through counsel, and for its

Complaint states as follows:

## PARTIES

1.    HPIL is a Wyoming Corporation with its principal place of business in Southampton,

New Jersey.

2.      Defendant Haining Zhang  ("Zhang") is a resident of Stroudsburg, Pennsylvania and filed

a case in the 42nd Circuit Court in Midland County, Michigan to name Defendant Angela

Collete ("Collette") as receiver in <u>Zhang v. HPIL Holding, Inc.,</u>  File No. 20-06979-CB-

C (the "Midland County lawsuit").  (**Exhibit 1**).

3.      Defendant Stephen Brown ("Brown") is a resident of Vancouver, British Columbia,

Canada who claims to have  "purchased" HPIL from Zhang and Collette after they

obtained control of HPIL through fraudulent means as described below.

4.      Colette resides in Ocala, Marion County, Florida, is an attorney licensed in Michigan,

New York, and Kentucky, and was appointed receiver through the above-cited Midland

County Court lawsuit.

5.      Defendant Andrew Badger ("Badger") resides in Hopewell Junction, Dutchess County,

New York, funded Stephen Brown's participation in the Midland County lawsuit, and has

been assisting Brown in schemes to raise funds to replace HPIL with another shell

company to raid.

6.      Defendant Mark Osborne ("Osborne") resides in Crawford, McLennan County, Texas,

funded Stephen Brown's participation in the Midland County lawsuit, and has been

assisting Brown in schemes to raise funds to replace HPIL with another shell company to

raid.

7.      Defendant Darcy Christopherson ("Christopherson") is a resident of Mesa, Maricopa

County, Arizona, is actively participating in fraudulent activities described in this

Complaint and has attempted to influence the Midland County lawsuit.

8.      Defendant Crank Media, Inc. ("Crank") is a Nevada corporation that is controlled solely

by Brown and is located in the office space Brown claimed was occupied by HPIL,

received significant funds from HPIL, and serves as a mechanism to move funds from HPIL to the named Defendants and other unknown parties.

9.  Defendant David Postula ("Postula") resides in Park City, Summit County, Utah and has served as HPIL's "President" from April 2021 until at least August 2022 and served prior to that as an executive for Crank.  Postula has been actively participating in fraudulent activities to which he obtained an interest as a result of the Midland County lawsuit. Postula is, according to Brown's claims, the second largest shareholder in HPIL and holds in excess of six billion shares.

10. Defendant Brown Family Investments,  Ltd.  ("Brown Family Investments") is a Vancouver, British Columbian corporation, wholly owned by Brown, and is located in the same office space as Brown claimed was occupied by HPIL, owns approximately eight billion shares of HPIL and, upon information and belief, is used to hold money and assets to protect them from Brown's myriad judgment creditors.

11. Defendant Criteria Management, Ltd ("Criteria") is a Vancouver, British Columbian corporation, controlled by Brown, which resides in the same office space as Brown claimed was occupied by HPIL, has been privately and publicly touted by Brown as an alternative to HPIL, and, upon information and belief, is used as a device for moving funds out of and around HPIL and has been used in various fundraising activities by Brown, Badger, Osborne, and Christopherson.

**NATURE OF THE ACTION**

12. HPIL incorporates Paragraphs (1) to (11) above to the same extent as though fully set forth herein.

13.    This matter involves two separate but related civil conspiracies which began in Midland, Midland County, Michigan.

14.    HPIL was initially incorporated in Nevada and continued to Wyoming on March 22, 2019 and which it remains as a corporation in good standing.  (**Exhibit 2**).

15.    This matter comes before this Court following the succession of opportunistic actors who each had a scheme to obtain as much money using HPIL as a mechanism to enrich themselves at the expense of HPIL and its shareholders.

16.    HPIL was an operating concern with its principal place of business in the Midland, Michigan and in fact was conducting business well after the date the events giving rise to HPIL's claims began to materialize.

17.    Zhang and Collette acquired control of HPIL by obtaining  a court ordered receivership which was procured via fraudulent and impermissible means and without notice or service of process on HPIL, its registered agent, its statutory agent, or its officers and directors.

18.    Zhang and Collette then increased the number of HPIL's authorized shares to dilute the shares of then current shareholders thus enable them to transfer HPIL, for substantial profit to them, to a party seeking a target for a reverse merger .[1]

---

[1]

      A reverse merger is a transaction in which a privately held corporation acquires a publicly traded corporation, thereby allowing the private corporation to transform into a publicly-traded corporation without the necessity of making an initial stock offering. Often, and in the three reverse mergers at issue here, the public corporation is a shell company with minimal assets and liabilities and no actual operations. To effect the reverse merger, the shell public corporation will exchange its treasury stock for all outstanding shares of the privately held corporation. In consideration, the controlling shareholders of the shell public corporation transfer a majority of their shares to the owners of the private corporation. After the transaction, the newly merged public corporation will assume the identity and name of the former private company. Thus, the private corporation is transformed into a publicly traded company, without going through the complicated process of an initial stock offering.

<u>S.E.C. v. M a West</u>, 538 F.3d 1043 (9th Cir. 2008)

19.     Zhang and Collette found that party in Brown to whom they transferred "ownership" of HPIL in exchange for cash and stock considerations (not for shareholders, but rather solely for themselves).  (**Exhibit 3**).

20.     Brown and his cohorts then engaged in what is known as a "pump and dump" scheme. The classic variation on this is when a party causes the value of shares in a company to increase through fraudulent statement and means and then sells those shares at the inflated price.[2]  This clearly affects the shareholders unaffiliated with the scheme as they are left with stock which was either purchased at the inflated rate or which loses value once the parties commit the fraud dump their shares.   In another variation of this scheme, instead of selling the inflated stock, the offending party transfers assets out of the company into their own privately held companies, transfer liabilities into the company from their own privately held companies, or uses the publicly traded company to ensure that they are getting paid extremely well despite the lack of value added to the company.[3] Both of these generally involve "reverse mergers" such as that which is present in this case.

21.     Once HPIL became aware of Zhang and Collette's actions, shareholders, including Philbrick, intervened and the court dismissed Zhang's Midland County complaint for lack of actual and constructive service and lack of subject matter jurisdiction.  The shareholders filed counterclaims which were dismissed for lack of an actual written demand on Amersey.

---

[2] See, e.g., United States v. Zolp, 479 F.3d 715, 717 n.1 (9th Cir. 2007) citing Securities and Exchange Commission, Fast Answers: Pump and Dump, available at http://www.sec.gov/answers/pumpdump.htm (explaining how a "pump and dump" scheme works).

[3] [3]See, e.g., Kruss v. Booth, 185 Cal.App.4th 699, 703-09 (Cal. Ct. App. 2010) (explaining this twist on the pump and dump scheme).

22.     HPIL has identified approximately three million dollars which Brown, with the assistance

        of Postula, raised using HPIL and distributed to themselves, Crank, and Brown Family

        Investments, and others involved in this scheme.  Since Brown is loath to disclose <u>any</u>

        financial documents, it can only be assumed that more debts have been incurred in which

        HPIL has yet to discover.

23.     As a direct and proximate cause of Defendants' actions, HPIL has incurred financial

        losses caused by damage they have caused to HPIL's name, its existing enterprises,

        creditworthiness, and loss of business opportunity.

24.     Zhang filed a petition for in Clark County, Nevada,  <u>In the Matter of HPIL Holding</u>,

        Clark County File No. A-23-869957-P, during the pendency of another case alleging

        HPIL's abandonment.  Zhang was granted a default judgment after making false

        statements and again failing to serve necessary parties at addresses where they could even

        conceivably receive notice.

25.     HPIL is requesting this Court grant HPIL injunctive relief precluding Brown and his Co-

        Defendants from conducting any activities which involve HPIL in any manner.

26.     HPIL seeks to recover the damages resulting from these fraudulent actions and injunctive

        relief precluding Brown from further actions on behalf of HPIL and enjoining him and

        the other named Defendants from participating in such further misconduct,


**JURISDICTION AND VENUE**

27.     HPIL incorporates Paragraphs (1) to (26) above to the same extent as though fully set

        forth herein.

28.   This Court has jurisdiction based upon diversity of citizenship as HPIL does not share domicile with any Defendant and the amount in controversy exceeds seventy-five thousand dollars.  28 U.S.C. § 1332.

29.   This Court has original subject-matter jurisdiction pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 because this action arises, in part, under the Federal Wire Fraud Statute and the Racketeer Influenced and Corrupt Organizations Act ("RICO").

30.   This Court has jurisdiction to determine HPIL's claims for equitable, declaratory, and injunctive relief are by 28 U.S.C. §§ 2201 & 2202.

31.   This Court has supplemental jurisdiction over HPIL's state law claims as all claims arise out of the same set of operative facts.   28 U.S.C. § 1367 (a).

32.   Venue is proper in this District as all claims originated in Midland County, Michigan, all parties conducted activities directed at the State of Michigan, availed themselves of Michigan laws and its legal system, conducted business in Michigan, and HPIL operated entirely out of Midland, Michigan before and during the fraudulent activities so complained.  Given these facts, and that no other district has personal jurisdiction over all defendants, the ends of justice require this Court's exercise of personal jurisdiction over all named defendants.

## FACTS COMMON TO ALL CLAIMS

33.   HPIL incorporates Paragraphs (1) to (32) above to the same extent as though fully set forth herein.

34.   Christopher Philbrick HPIL's sole director and chief executive officer ("CEO")  and was appointed to these by former director and CEO Nitin Amersey ("Amersey") and former

director John Mitchell ("Mitchell") on October 17, 2022 upon which Amersey and

Mitchell resigned.  Philbrick then moved the company's headquarters from Midland,

Michigan to Southampton, New Jersey.

35.     Well into 2021, when HPIL became aware that Zhang filed the Midland County lawsuit

and had Collette appointed receiver, it was operating and developing a diverse portfolio

of businesses in which to fund and grow and had two directors and three additional

officers.  HPIL was meeting with potential investors to obtain funding for its various

ventures, working to procure real estate for a new corporate headquarters, and working to

develop and expand its portfolio of operating businesses.  Significant work was done

developing the subsidiaries as well, finding new markets and growing existing markets,

prosecuting patent applications, testing of new and existing technologies, sales, and

marketing.

36.     The time and expenditure that HPIL and its officers made on its behalf in developing the

company were completely lost as a result of the actions taken in this Complaint.

37.     On April 13, 2020, Zhang initiated the Midland County lawsuit seeking to have Collette

appointed HPIL's receiver to "rehabilitate" HPIL as he claimed it was abandoned.

38.     Immediately upon being appointed, Collette increased HPIL's authorized shares from

approximately eight billion shares to two hundred billion shares.

39.     On April 7, 2021, HPIL, through Zhang and Collette, purportedly entered into an

"Agreement and Plan of Reorganization" which transferred ninety-two percent (92%) of

HPIL's shares to a private Canadian company known as Cybernetic Technologies, Ltd.

which Brown  wholly owned.   For "services rendered", Zhang would retain four percent

(4%) of the shares of HPIL and Collette would receive two percent (2%), neither of

which could be subject to dilution.  The agreement also stated that two percent (2%) of the shares would be retained by "non-affiliated shareholders" (the term "non-affiliated shareholders" is not defined, but a fair assumption it would mean those shareholders whose shares were diluted to make this deal work and were not party to this agreement). In addition, Zhang and Collette were to be paid fifty thousand dollars.  (**Exhibit 3).**

40.   Collette, in her final report and accounting as receiver, noted that a new management team had been appointed, however there was no mention of this agreement in the final report.  (**Exhibit 4**).

41.   Upon execution of this agreement, Brown, assumed the titles of HPIL's sole director and CEO and named Postula as its President.

42.   Zhang and Collette undertook their scheme knowingly, willfully, or in reckless disregard of the law and were aware that their actions would deprive HPIL and its shareholders out of property and equity.

43.   Zhang has filed at least twenty complaints seeking to have a receiver or custodian appointed over a corporation for the purpose of gaining control over these corporations to exploit these organizations for legally prohibited purposes.

44.   Collette has been appointed receiver or custodian, or has orchestrated the appointment of a receiver or custodian, on at least twenty occasions for the purpose of gaining control over these corporations to exploit these organizations for legally prohibited purposes.

45.   Most or all of communications, whether in oral or in electronic form, negotiations, document preparation, and execution of the alleged transfer of HPIL used the telephone, electronic mail and other internet means of communication.

46.  These actions were conceived and undertaken to have an  effect on commerce across state and international boundaries.

47.  Once the alleged transfer was complete, Brown began raising funds using HPIL.  Within the first month, Brown raised in excess of one hundred and twenty thousand dollars through the sale of three convertible promissory notes to GPL Ventures, LLC ("GPL"), a toxic lender that specializes in loaning money to companies desperate for capital funding which lack the collateral and resources to obtain funding through conventional means.  (**Exhibit 5, Exhibit 6, & Exhibit 7**).

48.  Toxic lenders lend money  and similar companies lend money to companies who are unable to raise capital in any other manner.  These "convertible notes" serve as security for the loan, and which can be converted into the right to purchase deeply discounted shares upon the maturity of the note.  These notes often carry usurious interest rates, and it is not anticipated that they will ever be paid back.  Once the note matures, the toxic lender may exercise its rights under the note and purchase the discounted shares which are then free from restriction and immediately tradeable.  The shares are then sold at an immense profit.

49.  Within mere weeks of Brown's "acquisition" of HPIL,  Brown caused HPIL to guarantee a promissory note for $400,000.00 which was given for a debt owed by Brown personally and by Crank and had  no connection to HPIL and is an unrelated entity.   (**Exhibit 8**).

50.  With the sole exception of press releases and other documents intended to "hype" HPIL, Brown has never released a single page of a single document providing information which could support any of his claims as HPIL's financial status.

51. In just a few months, investor interest began to grow and the value of HPIL's shares grew exponentially.

52. The increase in share value and investor interest was not the result of Brown's management and entrepreneurial skills, but rather a reaction to Brown's false statements concerning HPIL's assets, projects, funding, and management acumen.

53. Brown made a long line of false statements promoting his efforts to procure and establish business for HPIL and to establish strategic partnerships which would benefit HPIL and its shareholders.  These claims were intentionally made to inflate the price of stock to encourage lenders and investors to provide funding to HPIL, which Brown and those involved with Brown would convert to their own personal use.

54. Brown would hold regular "shareholder conference calls" via telephone or video conference means to address shareholders throughout the United States to disseminate false and misleading statements regarding the nonexistent products and technology he claimed HPIL was  developing.

55. Postula would also lead some of these "shareholder conference calls"  and he would often be present to assist Brown by answering questions and discussing development and manufacturing issues in order to add credibility to the false claims being made.

56. A sample of these provably false claims are as follows:

   a. On May 4, 2021, Brown caused a press release to be publicly submitted which stated that HPIL had entered into an agreement with Origin Protocol to mint non-fungible tokens ("NFTs").  Origin Protocol had never entered into any agreement with HPIL. It denied this claim on a YouTube video in which a representative from Origin seemed unsure who HPIL was and denied any such partnership.   This denial is

available at https://www.youtube.com/watch?v=lAek4D6EMK0&t=2385s (last

visited August 5, 2023) (this link will take the reader directly to the pertinent

statement).

b.  On July 22, 2021, Brown caused a press release to be publicly submitted which stated

that HPIL would be launching a "revolutionary new gaming platform" which will

have worldwide reach with cash prizes, tokens (which he referred to as

"GAMEZCASH TOKENS").  Brown failed to produce evidence that there was any

such platform in development, let alone ready for commercial launch, and eventually

quit speaking of it as if it had never existed.

c.  On July 23, 2021, Brown caused a press release to be publicly submitted which stated

that "Medusa Intelligence", which Brown claimed was a division of HPIL would be

launching new  "Meta Data Analytics" software which would use artificial

intelligence to revolutionize the entertainment industry, change the internet, and even

human thought processes.  Despite using so many twenty-first century buzzwords,

there was never any indication of any actual product even in development and

Medusa Intelligence, this division of HPIL, was anything more than a corporate filing

fee.

d.  On September 28, 2021, Brown caused a press release to be publicly submitted which

stated that HPIL was selling the assets of one of HPIL's divisions to Stargaze

Entertainment Group, Inc. ("Stargaze) in which all HPIL shareholders would obtain

shares of Stargaze in exchange for the sale of the assets with the sale closing on

October 15, 2021.  On October 18, 2021, Brown caused a press release to be publicly

submitted which stated that the sale of assets to Stargaze had closed and shares of

12

Stargaze would be disbursed to HPIL shareholders within thirty days of the press release. There is no evidence of any transfer of "assets" and, Brown, after making numerous statements that the transfer to the shareholders was delayed for reasons "beyond his control", eventually ceased mentioning that this had ever happened.

e. Brown claimed that in press releases and on a video conference call for investors that he and "trusted investors" would participate in a "share buyback" event which would be held on September 17, 2021in which current HPIL shareholders could sell their shares back at the market rate. Brown stated that he would know that rate at which the shares would be purchased on September 16, 2021 and clearly let shareholders know that it could be as high as two cents ($.02) which was six to eight times the proposed value of the shares at the time. This call, in its pertinent form, is available at https://www.youtube.com/watch?v=h-SNCXaV__g (last visited August 5, 2023). This buyback proposal, which, unsurprisingly, never occurred, created significant buzz and increased share value.

f. On March 24, 2022, Brown caused a press release to be issued which touted new video games, new technology, new intellectual property, and other technology, none of which came to fruition.

g. Throughout 2021 and into 2022, Brown claimed that he had procured for HPIL the technology for an electric automobile that would charge itself while operating. On June 15, 2021, Brown caused a press release to be publicly submitted announcing the formation of Apogee Dynamics, Ltd, ("Apogee") stating that it will be developing its own electric car and further stating that "WE MANUFACTURE POWER TRAINS THAT BUILD THEIR ENERGY RESERVES WHILE IN USE INSTEAD OF

PLUGGING THEM INTO A POWER OUTLET." Brown further made public statements that he would have up to ten different companies partnering in manufacturing the Apogee automobile utilizing "DISRUPTIVE business models" to increase demand for this "amazing" technology. Brown has never produced a shred of evidence that any such technology exists or that HPIL had access to that technology.

h. On September 27, 2021, Brown caused a Securities and Exchange Commission ("SEC") Form 8-K to be filed which claimed he secured a ten million dollar line of credit for HPIL. "The funds will be used for the expansion of the Company by adding an Auto Robotic center of approximately 5,0000 sq. feet in Kent, Washington and all the equipment that will operate at the center." There has been no evidence provided that this line of credit was secured nor has there been any evidence provided of any "auto robotic" center was in the works.

i. Brown made consistently false statements to shareholders and potential investors claiming that he had retained various accounting firms to perform audits so that HPIL could comply with OTC Markets reporting requirements to provide investors with the knowledge necessary to make informed decisions regarding the health of the company. No accounting firms were ever retained, and none were intended to be retained as Brown had no intention of disclosing such information to shareholders or investors.

57. The false statements made in Paragraph (52) were made knowingly, intentionally, and purposefully as part of a scheme to defraud lenders, investors, and HPIL.

58. The false statements made in Paragraph (52), whether in oral or in electronic form, were published over the internet, across state and international boundaries, and via the use of other electronic and telephone communications and directed at commerce across state lines.

59. Brown, on numerous occasions, falsely claimed in shareholder phone conferences and in other media that the only money that was ever put into HPIL came from his personal funds and that there were no outside sources of funding obtained.  Brown claimed that he had put $700,000.00 to $900,000.00 of his own money into HPIL and had never taken a dime for himself.  There is no evidence which supports his claims and mountains of evidence which contradict his claims.

60. These demonstrably false claims caused share prices to increase more than tenfold during the first few months that Brown was purportedly managing HPIL and set the table for the ill-gotten windfall that would be obtained.

61. Immediately after the Transfer, Brown began securing funding for HPIL and entered into numerous loan agreements from various funding sources.  None of these loan agreements were disclosed to investors or to the public in accordance with his narrative.

62. On September 27, 2021 and October 1, 20221, as HPIL's share value was soaring, Brown entered into two agreements with Auctus Fund, LLC, another toxic lender, to loan HPIL $1,300,000.00 via two $650,000.00 convertible loan agreements.

63. It is unknown if other such notes exist as Brown has been tight lipped about his fundraising, self-dealing, and embezzlement.   However, the discovery process will make the full extent of the damages known.

64.     In January 2022, Brown and Postula, ostensibly "acting" on behalf of HPIL, entered into a series of loan agreements with two private investors to obtain funds for the nonexistent Apogee electric vehicle division.  This was accomplished a series of telephone and video conference calls taking place across state and international borders as well as in person meetings with Postula in Washington State.

65.     Postula took the lead on this effort and was involved with most of the negotiations and communications with the investors.  To induce these investors to part with their money, Postula falsely represented to these investors that HPIL had engaged the international law firm of Sheppard, Mullin, Richter & Hampton, LLP to issue an attorney letter on its behalf authenticating HPIL's financial status.  These investors loaned HPIL in excess of one and a half million dollars based upon Postula's representations.  Postula, in addition to whatever payment he received from HPI,L, obtained an eighty thousand dollar commission for his efforts to swindle these investors out of their money.

66.     Brown and Postula falsely represented to these investors that Gem Investments Group, LLC had committed to investing fifty million dollars in HPIL.   Brown and Postula falsely claimed that all funds received would be used by Apogee in manufacturing its self-charging technology and that a demonstration of the Apogee technology would occur on February 15, 2022.  As that date passed, Postula gave these investors assurances of new deadlines which never came to pass.  Postula made numerous false representations to the investors in order to placate and pacify them.  When it became apparent to these investors than their investment was not going to fund operations as they had promised, they had one last meeting with Brown in which Brown offered them HPIL shares and

promises that they would be paid back immediately though the sale of HPIL shares.  To this day, these investors have not a penny back of the funds owed to them on their notes.

67.  Brown, Postula,  and those working and operating in conjunction with or under their direction, have, indebted HPIL least three million dollars in funding for HPIL via promissory notes and convertible notes and raised countless amounts of money through the sale of unregistered shares.

68.  The total amount of funds Brown obtained using HPIL is unknown as Brown has not disclosed anything to shareholders or investors and have only uncovered some of them after and have only been uncovered though sifting through court files, records of companies unrelated to HPIL, and conversations with convertible note holders.

69.  HPIL will face claims from the several investors for funds Brown, Postula, and the other Defendants obtained upon his false statements regarding the nonexistent products and services he claimed HPIL owned or was developing.  In addition to the potential liability resulting from the fraudulent activities, hundreds of thousands of dollars in attorney and professional fees will be incurred to repair the damage Defendants have done to HPIL.

70.  None of this money was used for the benefit of HPIL and Brown, Postula, and those working in conjunction with them used HPIL to raise funds for their own personal and business interests.  Throughout the time Brown had control of HPIL, it had no appreciable assets and since the date of the alleged transfer, there has been no serious effort to grow HPIL for the benefit of HPIL and its shareholders.

71.  Assets which Brown claimed he put into HPIL were illusory and consisted of companies with no assets or new companies which he formed himself with no assets or potential.

72.    There is concrete evidence which points to where some of the money which should have gone to HPIL's operations has gone and it is anticipated that discovery should quickly provide illumination on much of the rest.

73.    On November 1, 2021, Brown caused HPIL to loan Crank $808,500.00 at five percent annual interest (with interest not accruing until after May 1, 2022).  (**Exhibit 9**).  This loan, which was made to an unrelated company controlled by Brown and with Postula's involvement, on terms infinitely more favorable than HPIL received from its own creditors and without the threat of destruction of equity from these toxic lenders, with no benefit to HPIL, is the very definition of a fraudulent and self-dealing transaction.

74.    The loan, which was never disclosed to HPIL shareholders and only uncovered by viewing an unaudited  Crank Media filing, was never intended to be paid back.  Crank, whose assets are unknown, but believed to be limited or nonexistent, owes judgment creditors several million dollars.  This loan cannot be excused by business judgment.

75.    In another instance which has been identified noted above, Brown added HPIL as a party to a debt owed entirely himself and Crank within weeks of Zhang and Collette transferring control of HPIL to him.  When sued upon the note, HPIL generously settled this debt with four hundred thousand dollars' worth of HPIL stock.  (**Exhibits 8 & 10**).

76.    In August 2021, Brown told the son of the seller of the eight million dollar Vancouver home he entered into a 2019 purchase agreement to buy that he would be able to get funds from shares from the "new public company that he added that's more liquid than the Crank." This conversation is available at https://www.youtube.com/watch?v=GWApAhS4CAw (last visited August 6, 2023).

Brown was eventually evicted from the luxury home that he resided in for over three years without making payments on the home or paying rent.

77.  Browns claims of using his "personal fortune" to build HPIL may be easily dismissed. Brown personally has several million dollars' worth of judgments entered against him personally in the last few years.

78.  On April 14, 2022, a consent judgment was entered against Brown in the amount of 2,000,000 CAD (approximately US $1,480,000.00 as of the date of this submission). (**Exhibit 11**).

79.  Brown's conduct which in lawsuit described in paragraph (78) above are identical to that which is presented to this Court.  (**Exhibit 12**).  Brown made false representations regarding development of an "arena game" to induce investment from the plaintiffs. (**Exhibit 12 at ¶ 38 (f)**).  Brown, as he has in the present matter, made claims to the plaintiffs regarding agreements with established companies, that he had received large investments from well-known individuals, that he had expended personal funds, and that he had purchased significant assets to establish his "product."  (**Exhibit 12 at ¶¶ 38 (e-m)**).

80.  On July 28, 2022, a British Columbia Court entered a judgment against Brown in the amount of CAD  1,730,096.84 (approximately US $1,480,000.00 as of the date of this submission) for damages resulting from a contract breach.  (**Exhibit 13**).

81.  On August 10, 2023, a British Columbia Court entered a judgment against Brown in the amount of CAD  4,262,369.40 (approximately US $3,154,153.36 as of the date of this submission) for damages resulting from a contract breach.  (**Exhibit 14**).

82.    Brown filed for bankruptcy protection in the United Kingdom in 2016.  The court suspended discharge  on November 23, 2017 pending Brown's performance of conditions enumerated in a May 12, 2017 order.  (**Exhibit 15**).

83.    Brown is clearly using Crank and Brown Family Investments as mechanisms to keep these wrongfully obtained funds out of the hands of his creditors. .

84.    The true amount of funds that Brown, Postula, Crank, Brown Family Investments, and those working under their direction will be ascertained during discovery.

85.    Brown has refused to observe the mandatory reporting requirements necessary to keep HPIL tradeable on the open market.  Even though Brown constantly showered shareholders and investors with statements such was "HPIL will be current next week" and "I've engaged [fill in the blank] accounting firm to do the audit."   This never happened.  OTC Markets removed HPIL from being quoted on the open market.

86.    Brown, apparently taking the short game and trying to get as much cash out of HPIL as he could, solved this problem by never having an audit done.   Browns actions in obtaining private investors demonstrated that he believed he could keep up with his scheme without the shares being tradeable on the open market.

87.    On May 17, 2022, the British Columbia Securities Commission entered a Cease Trade Order to HPIL for failure to file the required financial statement and two disclosure forms designed to give investors and potential a clear picture of the company.  (**Exhibit 16**). Brown has done nothing to remedy the issues underlying the Cease Trade Order.

88.    While the shareholder counter-complaint against Zhang and Collette in the Midland County lawsuit was pending, their counsel became aware of the criminal activities Brown had undertaken.   It required a legal pronouncement that Brown had no interest in HPIL

for them to try to salvage the destruction that Brown and the other Defendants had wrought.

89. Brown, aware that the shareholders were seeking to put an end to his shenanigans, filed a motion to intervene as well as a motion to reinstate Zhang's dismissed claim and reinstate the default judgment appointing Collette as receiver.

90. Badger and Osborne, on their own admission, financed Brown's participation in the Midland County lawsuit. It is unknown what consideration that they received for this, but they have worked directly with Brown on various schemes.

91. The court granted Brown's motion to intervene but denied which request to be named HPIL's CEO and for reinstatement of the default judgment. Brown, despite his claims of protecting the interests of both himself and HPIL, voluntarily dismissed his intervening plaintiff-complaint and sought to remove himself entirely from the litigation. Brown had no interest whatsoever in being subject to discovery and examination as a witness. The shareholder counter-claim against Zhang and Collette was dismissed with their other claims as no demand had been made on Amersey and it remained a shareholder derivative action.

92. Even as Brown's house of cards began crumbling when he was denied a declaratory judgment naming him CEO, he and his willing co-conspirators had been engaging in activities to ensure that their investments would be protected and continue to grow.

93. Brown has worked specifically with a group of alleged HPIL shareholders, including Badger, Osborne, and Christopherson to solicit funds, communicate with parties on his behalf, and make false statements supporting Brown's scheme.

94. Badger, Osborne, and Christopherson have received shares in HPIL, Crank, and Criteria, and other forms of consideration for the assistance that they provided Brown.

95. Brown, Badger, Osborne, and Christopherson would pass out shares of HPIL, Crank, and Criteria to individuals in exchange for investments and assistance in pumping up Brown's business ideas and monitoring online activities which could negatively affect their schemes.

96. Brown, Badger, Osborne, and Christopherson have been touting Criteria as the next part of Brown's plan to create the next generation of millionaires by investing their money with him.  Criteria is inextricably linked to HPIL and Crank with Brown Family Investments holding a portion of Brown's fraudulently obtained assets.

97. Badger and Osborne hired a Michigan attorney to send out "cease and desist" letters threatening various individuals whom they accused of publishing "defamatory and disparaging" statements Brown, themselves, and any companies affiliated with Brown. (**Exhibit 17**).

98. Brown, Badger, and Osborne have spoken to Philbrick on numerous occasions and have promised him a very large amount of HPIL, Crank, and Criteria shares if he would join them.  In phone calls to Philbrick without Brown's participation, Badger and Osborne defended Brown and his activities.  They advised Philbrick that they were Brown's "point men" and that if Philbrick had anything they wanted to discuss with Brown, they should contact them first.

99. On November 29, 2022, in a text conversation with Zhang and Collette Christopherson advised them, when deposed the following day regarding the Midland County lawsuit,

that they testify that that they had a verbal agreement which superseded the April 7, 2021 Agreement and Plan of Reorganization.  (**Exhibit 18**).

100. Christopherson sought to incite these two witnesses  on Brown's behalf , with his blessing, and under his direction as Brown found it beneficial to replace the patently unlawful Agreement and Plan of Reorganization replaced by a subsequent "oral agreement."

101. In deposition, both Zhang and Collette testified that there was no agreement with Brown after the Agreement and Plan of Reorganization.

102. Christopherson has, on numerous occasions, via electronic means using the internet and other means of electronic communication across state boundaries, threatened various individuals with physical harm if they do not cease criticism of Brown.

103. Zhang filed a petition for in Clark County, Nevada,  In the Matter of HPIL Holding, Clark County File No. A-23-869957-P, claiming HPIL was abandoned he should be named custodian.   (**Exhibit 19**).  Zhang filed this petition as a shareholder who owns ten thousand shares of HPIL that he purchased in 2021 for $23.95.  (**Exhibit 19**).  Zhang claimed that HPIL was abandoned while still involved in litigation regarding it in Michigan.  He had HPIL served at the same inactive registered agent that he served the 2020 complaint on.  He made no mention of the continuance to Wyoming despite the fact that he and Collette filed several documents in Wyoming and was aware of the Wyoming Agents address.

104. Zhang made other false material misrepresentations on the form complaint he submitted to the Nevada court.   NRS 78.347(2)(a) requires an applicant petitioning for the appointment of a custodian to provide the court with "[a] detailed list of all previous

applications to a court in any jurisdiction for a custodianship of a publicly traded corporation that were filed by the applicant or an affiliate or subsidiary of the applicant." Zhang listed only three occasions in which he applied and successfully appointed as custodian.  It is believed that the number of times Zhang has petitioned a court for the appointment of a receiver or a custodian (the definition of "custodian" in the Nevada Code is identical to that of a "receiver") , in the last ten years, has been approximately twenty, including those filed on his behalf by his wife and others.   He neglected to mention to the court that he petitioned the Midland court for the appointment of Collete as HPIL's receiver.  (**Exhibit 19**).

105.   Section C of the Nevada form complaint requires the petitioner to give HPIL's history of incorporation.   Zhang neglected to advise the court that HPIL had been continued to Wyoming when providing the Court with the history of incorporation, despite having made, or having Collette caused to be made, several filings with the Wyoming Secretary of State.   (**Exhibit 19**).

106.   Zhang also claimed he made "demands" on HPIL's directors and officers before filing his Nevada action.   Zhang was aware Amersey and Mitchell are no longer directors.   Zhang was aware of that. Amersey and Mitchell appointed Philbrick director and CEO and then resigned.  Philbrick was not alerted as Zhang knew that he would respond as he was involved with litigation with him in Midland.  The court granted his petition as it was unopposed.   (**Exhibit 20**).

107.   Zhang, most brazenly, is currently trying to transfer HPIL and has been soliciting purchasers seeking to undergo a reverse merger as he and Collette did after Collette, at

Zhang's request, was appointed receiver in the Midland County litigation.  He is asking $200,000.00 from prospective purchasers.

108.   HPIL just aware of this lawsuit after Zhang received a default judgment appointing him HPIL's custodian and is addressing it now.  HPIL is requesting this Court enter a declaratory judgment determining control of HPIL and enjoining Zhang from taking further action as described below.

### COUNT I: (ZHANG AND COLLETTE) MALICIOUS PROSECUTION

**Jury Trial Requested**

109.   HPIL incorporates Paragraphs (1) to (108) above to the same extent as though fully set forth herein.

110.   MCL 600.2907 provides recourse for damages incurred when a party damages as a result of a civil or criminal action instituted for a purpose for which that action is not intended. The statute requires the responsible defendant to pay treble damages and attorneys' fees.

111.   Zhang, with the assistance of Collette, initiated the Midland County lawsuit seeking the appointment of Collette as HPIL's receiver with broad authority to "rehabilitate" HPIL pursuant to the dissolution provisions contained in Section 8 of the Michigan Business Corporations Act.  MCL 450.1801 et seq.   (**Exhibit 1**).

112.   Zhang and Collette knowingly and intentionally provided the Midland County Court with an incorrect state of incorporation for HPIL and an out of date address of its principal place of business in the summons, complaint, and all subsequent documents and pleadings.

113.    HPIL's correct address and the fact that it was continued in Wyoming was established in filings submitted in SEC filings made over a year before Zhang filed his Complaint that would have been reviewed by Zhang and Collette prior to or at the time the Complaint was filed.

114.    Service was made in Nevada upon a registered agent which was relieved of its duties on behalf of HPIL more than a year before the case was filed.  Since Zhang and Collette were aware, or should have been aware, that HPIL was continued to Wyoming, the correct agent could have been ascertained through Wyoming records.

115.    Neither HPIL, its officers, or its directors received notice that the action was pending or service of any court documents or correspondence with Collette after she was appointed receiver.

116.    On September 18, 2020, four days after receiving the order appointing her as HPIL's receiver, Collette filed documents in Wyoming filed reinstatement papers with the Wyoming Secretary of State clearly demonstrates that they were aware of HPIL's continuance and the correct address of service.  (**Exhibit 21**).

117.    Zhang and Collette knowingly and intentionally provided the Midland County Court with false address and incorporation information to preclude HPIL from obtaining service of process on the action and to ensure it would obtain a default and default judgment without dealing with HPIL's participation.

118.    Zhang, with the assistance of Collette, intentionally and falsely provided the court with a truncated quotation of the receivership provision contained in MCL 450.1851 to convince the court that they were entitled to the appointment of a receivership with the powers so listed in their proposed order.

119. On September 11, 2020, the court granted Zhang's request for a default judgment and September 14, 2020 entered an order appointing Collette HPIL's receiver.  (**Exhibit 22**).

120. Zhang and Collette have worked together on approximately twenty similar schemes to obtain control over various corporations for which they each stood (and often did) make a great profit.  These occurred not only in Michigan, but throughout the country.   They had a receiver appointed (in some jurisdictions known as a "custodian").  In most, if not all, of these occasions they would make false statements to obtain their desired relief.  They would always allege the same facts and their relief was always granted through a default judgment.  Zhang and Collette would then seek and obtain a buyer and transfer the company for money, shares, or both.

121. While Zhang and Collette deny that it was Collette who prepared the complaint in the Midland County lawsuit, at least two other cases, using the same truncated language were filed in  2020, one by Zhang on Oakland County, Michigan and the other by Collette's father, Ross Collette in Macomb County, Michigan.  (**Exhibit 23 & Exhibit 24**).

122. In another case in which Ross Collette filed a case for the appointment of a receiver,  a receiver was appointed following another default judgment, the receiver transferred the company to Zhang for an undisclosed sum.  (**Exhibit 25 & Exhibit 26**).  Zhang then sold his interest for $250,000.00 to a party who then used the company procured from the receiver to undergo a reverse merger.  (**Exhibit 26**).

123. Zhang's belief in the necessity of obtaining a default judgment was demonstrated in another matter in which the judge, with a careful eye on Hague Convention protocol, refused to grant him the requested default and spoke at length about Zhang's dubious claims of service. Zhang v. Kon Ki Lo, 14 Civ. 6945 (CM) (S.D.N.Y. May. 5, 2020).

124.    Zhang was not an aggrieved investor who lost his life savings and wanted to try to recoup it.  His investment, if he had any, in HPIL was solely made so that he could truthfully claim to be a shareholder of HPIL for the purpose of filing this case to get Collette appointed as an investor so they could cash in.

125.    Zhang and Collette had no concern whatsoever as to how their actions would affect other shareholders and investors.  Their only concern was the profit to be made when they transferred it.

126.    Collette, by omitting this transfer and her and Zhang's resulting windfall, in her Final Report and Account, demonstrated that she was well aware of the wrongdoing and it would be best to keep as  many references as possible of their conduct out of the public domain or the reviewing eye of a judge.  (**Exhibit 4**).

127.    On November 10, 2021, the court entered an order dismissing Zhang's Complaint in the Midland County lawsuit was dismissed.  (**Exhibit 21**).  The damage had already been done at that point and Brown and his associates had already begun using HPIL for their own devises.

128.    Zhang and Collette's actions were the actual and proximate cause of the damages HPIL has incurred.

129.    These damages included the loss of trust and value in HPIL's name, the losses from the businesses it was building prior to Zhang and Collette's actions, creditworthiness, and other damages arising from HPIL being deprived of access to itself.

130.    Zhang and Collette's actions clearly constitute the conduct which MCL 600.2907 and HPIL is entitled to damages accordingly.

## COUNT II: (ZHANG AND COLLETTE) ABUSE OF PROCESS

### Trial by Jury

131.   HPIL incorporates Paragraphs (1) to (130) above to the same extent as though fully set forth herein.

132.   A party is liable for the abuse of lawful process if the defendant has an ulterior motive in committing an act in the use of process which would be improper in normal proceedings. Liability will attach if the ostensible objective of the action is secondary to the ulterior purpose of action.

133.   Failure to provide accurate information regarding a party or its location for the purpose of obtaining a default judgment constitutes an abuse of process.

134.   Zhang, with the assistance of Collette, knowingly and intentionally misled the Midland court regarding entitlement for the appointment of the receiver to induce this Court to enter an order appointing Collette as HPIL's receiver.

135.   Zhang and Collette sought appointment of a receiver solely to obtain funds or property that they were not entitled to under Michigan law.

136.   This Court, relying on Zhang's representations, entered a default judgment against HPIL appointing Collette as HPIL's receiver.

137.   The facts presented clearly demonstrate that Zhang and Collette are liable to HPIL for all damages it has occurred stemming from their abuse of lawful process.

<u>COUNT III: (ZHANG) ABUSE OF PROCESS (NEVADA LAW)</u>

**Trial by Jury**

138.   HPIL incorporates Paragraphs (1) to (137) above to the same extent as though fully set forth herein.

139.   In Nevada, as in Michigan, a party is liable for the abuse of lawful process if the defendant has an ulterior motive in committing an act in the use of process which would be improper in normal proceedings.   Liability will attach if the ostensible objective of the action is secondary to the ulterior purpose of action.

140.   Making false statements to a court concerning material and statutorily required facts on a petition and the failure to provide accurate information regarding a party or its location for the purpose of obtaining a default judgment constitutes an abuse of process.

141.   Zhang intended for the Nevada court to rely on his false statements so that he could be granted custodianship of HPIL quickly and  without question.

142.   Zhang sought to be appointed HPIL's custodian solely to transfer it for personal profit and not on behalf of the shareholders as required under Nevada law.

143.   The Nevada Court, relying on Zhang's representations, entered a default judgment against appointing him HPIL's Custodian.

144.   Zhang is liable to HPIL for all damages it has occurred stemming from his abuse of lawful process.

<u>COUNT IV: (ZHANG AND COLLETTE) MCL 450.1541a Liability</u>

**Trial by Jury**

145. HPIL incorporates Paragraphs (1) to (144) above to the same extent as though fully set forth herein.

146. MCL 450.1541a states that a corporate officer must discharge his or her duties "(a) in good faith, (b) [w]ith the care an ordinarily prudent person in a like position would exercise under similar circumstances, [and] (c) [i]In a manner he or she reasonably believes to be in the best interests of the corporation."

147. A corporation may maintain an action against one of its officers for damages arising from the breach of their duties under MCL 450.1541a.

148. Pursuant to the default judgment Zhang and Collette obtained in the Midland County litigation, Collette as receiver and Zhang, with the authority granted him to oversee the receiver, became officers of HPIL. (**Exhibit 28**).

149. Zhang and Collette breached these duties to HPIL and its shareholders by entering into an agreement with Brown solely for their own benefit and to the detriment of those who did not participate in their scheme.

150. Zhang and Collette further breached these duties by transferring HPIL to Brown who, if they had done a careful investigation and done due diligence on Brown and his financial status.

151. As a direct result of Zhang and Collette's noncompliance with their statutory duty, HPIL has suffered damages and described above in this Complaint.

152. HPIL is entitled to a judgment against Zhang and Collette in the amount of all damages suffered as a result of their breach of MCL 600.2919a duties.

<u>COUNT V: (ZHANG, COLLETTE, BROWN, CRANK, BROWN FAMILY INVESTMENTS,</u>

<u>AND CRITERIA) CONVERSION / EMBEZZLEMENT</u>

**Trial by Jury**

153.    HPIL incorporates Paragraphs (1) to (152) above to the same extent as though fully set

forth herein.

154.    MCL 600.2919a (1) states:

> A person damaged as a result of either or both of the following may recover 3
> times the amount of actual damages sustained, plus costs and reasonable
> attorney fees.
>
> a. Another person's stealing or embezzling property or converting property to
> the other person's own use.
>
> b. Another person's buying, receiving, possessing, concealing, or aiding in
> the  concealment of stolen, embezzled, or converted property when the
> person buying, receiving, possessing, concealing, or aiding in the
> concealment of stolen, embezzled, or converted property knew that the
> property was stolen, embezzled, or converted.

155.    Once Zhang  and Collette obtained control of HPIL they converted it for their own use

when transferring it for their own use.

156.    Brown obtained HPIL from Zhang and Collette and converted it for his own use by using

it to obtain funds and then to use the funds for his own purposes.

157.    Brown transferred funds he raised through HPIL through a series of loans and payments

to Crank, Brown Family Investments, and Criteria.

158.    Each of these actions were done to permanently deprive HPIL of money and property.

159.    HPIL has incurred significant losses because of this Defendants conversion of its

property and is entitled to the resulting damages, trebled, as well as costs and attorneys'

fees.

<u>COUNT VI: (ZHANG, COLLETTE, BROWN, AND POSTULA) BREACH OF FIDUCIARY</u>

<u>DUTY AND SELF DEALING</u>

**Trial by Jury**

160. HPIL incorporates Paragraphs (1) to (159) above to the same extent as though fully set forth herein.

161. The default judgment which appointed Collette HPIL's receiver also gave Zhang authority to oversee and veto or ratify Collette's actions. (**Exhibit 28**).

162. By virtue of these requested appointments, Zhang and Collette owed HPIL and its shareholders a duty to act in the best interest of HPIL and its shareholders.

163. Zhang and Collette breached that duty to HPIL and its shareholders entering into an agreement with Brown solely for their own benefit and to the detriment of those who did not participate in their scheme.

164. Brown, even with illegitimate control of HPIL, owed a fiduciary duty to HPIL and its shareholders when took control of it.

165. Postula, acting as HPIL's "president", owed a duty to HPIL and its shareholders to act in their best interests when handling company matters.

166. Brown and Postula breached their fiduciary duties when they artificially inflated the value of HPIL's shares and caused it to incur millions of dollars in liabilities to which HPIL received no value.

167. HPIL is entitled to a judgment against Zhang, Collette, Brown, and Postula in the amount of all damages suffered as a result of their breach of their fiduciary duties.

## COUNT VII: (ZHANG & COLLETTE) CIVIL CONSPIRACY

**Trial by Jury**

168. HPIL incorporates Paragraphs (1) to (167) above to the same extent as though fully set forth herein.

169. Zhang and Collette acted in concert to use, and did use, the fraudulent acts and misrepresentations described above to unlawfully obtain control of HPIL so that they could transfer it for personal gain.

170. This conspiracy, and the actions which were foreseeable and directly followed, deprived HPIL and its shareholders of property, equity, business opportunities, and creditworthiness, resulting in significant economic loss to HPIL.

## COUNT VIII: (BROWN, POSTULA, CRANK, BROWN FAMILY INVESTMENTS, AND CRITERIA) CIVIL CONSPIRACY

**Trial by Jury**

171. HPIL incorporates Paragraphs (1) to (170) above to the same extent as though fully set forth herein.

172. Brown, Postula, Crank, Brown Family Investments, and Criteria acted in concert to use, and did use, the fraudulent acts, misrepresentations, extortion, embezzlement described to procure money using HPIL for their own personal use.

173. This conspiracy deprived HPIL and its shareholders of property, equity, business opportunities, and creditworthiness resulting in extensive financial loss to HPIL to which it is entitled to damages.

COUNT IX: (BROWN, BADGER, OSBORNE, AND CHRISTOPHERSON, CRANK,

BROWN FAMILY INVESTMENTS, AND CRITERIA) CIVIL CONSPIRACY

**Trial by Jury**

174.	HPIL incorporates Paragraphs (1) to (173) above to the same extent as though fully set forth herein.

175.	Brown, Badger, Osborne, Christopherson, Crank, Brown Family Investments, and Criteria acted in concert to use, and did use, the fraudulent acts, misrepresentations, extortion, embezzlement described to procure money using HPIL for their own personal use.

176.	This conspiracy deprived HPIL and its shareholders of property, equity, business opportunities, and creditworthiness resulting in extensive financial loss to HPIL.


COUNT X: (ZHANG & COLLETTE) RICO 18 U.S.C. § 1964(c)

**Trial by Jury**

177.	HPIL incorporates Paragraphs (1) to (176) above to the same extent as though fully set forth herein.

178.	Zhang and Collette are "persons" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961 (3).

179.	Zhang and Collette violated 18 U.S.C. 3 1962(c) by the acts described in the prior paragraphs, and as further described below.

180.	Zhang and Collette form an association-in-fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. 3 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering

activity.  This enterprise has engaged in, and their activities have affected, interstate commerce.

181. Zhang and Collette did knowingly, willfully, and unlawfully conduct or participate, directly participated in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. 6 I96 1 (1), 1961 (3), and l962(c). Zhang and Collette did have the specific intent to engage in the RICO violations alleged herein.

182. Zhang and Collette participated in indictable offenses under 18 U.S.C § 1343 in that they conspired to defraud HPIL and others by making the false statements described above which were transmitted or caused to be transmitted by means of wire communications in interstate commerce various writings, signs, and signals.  The acts of Defendants set forth above were done with knowledge that the use of the wires would follow in the ordinary course of business. or that such use could have been foreseen, even if not actually intended. These acts were done intentionally and knowingly with the specific intent to advance their scheme.

183. Zhang and Collette carried out their scheme in several states over the course of several years and would have been unable to do so but for their use of the telephone, wires, and other electronic means to communicate with the courts and to find and negotiate with purchasers for their hijacked companies.

184. Zhang and Collette have been engaging in this scheme for at least the past ten years defrauding companies and shareholders for their own financial gain.   These violations were a part of a pattern of racketeering activity under 18 U.S.C. §§ 1961(l) and (5).

185. These unlawful acts caused injury to HPIL as described above.  HPIL accordingly seeks an award of three times the damages it sustained, and the recovery of reasonable

attorneys' fees and costs of investigation and litigation, as well as any other relief

authorized by statute.

## COUNT XI: (BROWN, POSTULA, BADGER, OSBORNE, CHRISTOPHERSON, CRANK, BROWN FAMILY INVESTMENTS, AND CRITERIA) RICO 18 U.S.C. § 1964(c)

**Trial by Jury**

186.   HPIL incorporates Paragraphs (1) to (185) above to the same extent as though fully set

forth herein.

187.   Brown, Postula, Badger, Osborne, Christopherson, Crank, Brown Family Investments,

and Criteria are "persons" capable of holding legal or beneficial interest in property

within the meaning of 18 U.S.C. § 1961 (3).

188.   Brown, Postula, Badger, Osborne, Christopherson, Crank, Brown Family Investments,

and Criteria violated 18 U.S.C. 3 1962(c) by the acts described in the prior paragraphs,

and as further described below.

189.   Brown, Postula, Badger, Osborne, Christopherson, Crank, Brown Family Investments,

and Criteria form an association-in-fact for the common and continuing purpose

described herein and constitute an enterprise within the meaning of 18 U.S.C. 3 1961(4)

engaged in the conduct of their affairs through a continuing pattern of racketeering

activity.  This enterprise has engaged in, and their activities have affected, interstate

commerce.

190.   Brown, Postula, Badger, Osborne, Christopherson, Crank, Brown Family Investments,

and Criteria did knowingly, willfully, and unlawfully conduct or participate, directly

participated in the affairs of the enterprise through a pattern of racketeering activity

within the meaning of 18 U.S.C. 6 I96 1 (1), 1961 (3), and l962(c).  Brown, Postula, Badger, Osborne, Christopherson, Crank, Brown Family Investments, and Criteria did have the specific intent to engage in the RICO violations alleged herein.

191.   Brown, Postula, Badger, Osborne, and Christopherson participated in indictable offenses under 18 U.S.C § 1343 in that they conspired to defraud HPIL and others by making the false statements to potential investors as described above which were transmitted or caused to be transmitted by means of wire communications in interstate commerce various writings, signs, and signals.  The acts of Brown, Postula, Badger, Osborne, and Christopherson set forth above were done with knowledge that the use of the wires would follow in the ordinary course of business. or that such use could have been foreseen, even if not actually intended. These acts were done intentionally and knowingly with the specific intent to advance their scheme.

192.   Brown, Postula, Badger, Osborne, and Christopherson made use of wire communications across state lines to recruit potential co-conspirators and harass and intimidate dissenters over the course of the past two years.  These acts were done intentionally and knowingly with the specific intent to advance their scheme.

193.   Christopherson's attempt to procure false testimony from Zhang and Collette is an indictable felony.  MCL 750.425  provides that it is a felony punishable by up to five years in prison if any person endeavors "to incite or procure any person to commit the crime of perjury" even if no perjury was committed.  "Perjury" is defined as making a false statement under oath.  MCL 750.423.   Christopherson's acts were done intentionally and knowingly with the specific intent to advance the enterprise's scheme.

194. Brown, Crank, Brown Family Investments, and Criteria embezzled funds and property as described above using means of interstate commerce and across state and international lines.

195. Brown, Postula, Badger, Osborne, Christopherson, Crank, Brown Family Investments, and Criteria carried out their scheme in several states over the course of two years and would have been unable to do so for their use of the telephone, wires, and other electronic means to communicate with investors, shareholders, and other parties necessary to their scheme.

196. Brown, Postula, Badger, Osborne, Christopherson, Crank, Brown Family Investments, and Criteria have been engaging in this scheme for at least the past two years defrauding companies and shareholders for their own financial gain.   These violations were a part of a pattern of racketeering activity under 18 U.S.C. §§ 1961(1) and (5).

197. These unlawful acts caused injury to HPIL as described above.  HPIL accordingly seeks an award of three times the damages it sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief authorized by statute.

## COUNT XII: (BROWN) CLAIM AND DELIVERY

### Trial by Jury

198. HPIL incorporates Paragraphs (1) to (197) above to the same extent as though fully set forth herein.

199. Brown is in possession of books, records, contracts, and other documents which rightfully are the property of HPIL which he unlawfully retains.

200.   MCR 3.105 authorizes HPIL to maintain action to obtain the return of these books,

records, contracts, and other documents wrongfully retained.

## COUNT XIII: (ALL PARTIES) DECLARATORY JUDGMENT

### TRIAL BY THE JUDGE

201.   HPIL incorporates Paragraphs (1) to (200) above to the same extent as though fully set

forth herein.

202.   This Court has the authority to grant injunctive and declaratory relief pursuant to 28

U.S.C. §§ 2201 & 2202.

203.   HPIL is entitled to a declaration that Brown has no interest in HPIL and that any

document granting him authority is void for that purpose.

204.   A contract which is contrary to public policy is illegal and void. Public policy has been

defined as "the community common sense and common conscience, extended and

applied throughout the State to matters of public morals, public health, public safety,

public welfare, and the like." Skutt v. Grand Rapids, 275 Mich. 258, 264 (1936). The

transfer of a publicly traded company by persons who used fraudulent and deceptive

means to obtain this opportunity for personal profit is clearly offensive to the common

sense and conscience of any community. Zhang and Collette's conduct is not something

that is to be encouraged or tacitly supported.

205.   In addition, the order Zhang and Collette sought to use to transfer HPIL has been set

aside and Zhang's petition dismissed for lack of subject matter jurisdiction. Any order

which was entered into pursuant to a case so dismissed and any actions taken pursuant to said order are void <u>ab initio.</u>

206. Public policy favors granting such declaratory relief.  The actions taken by the Defendants in this matter shock the conscience.  Zhang and Collette's scheme set up Brown's scheme and everyone that was affiliated with them made money at the expense of HPIL and their shareholders.  This agreement was not made with the interests of HPIL, its shareholders, and the public in mind and violates numerous laws, rules, principles, and commonly held beliefs about decency, honesty, and fair play.

207. Zhang, Collette, and Brown did not take the actions necessary for a merger, which, according to the Agreement and Plan of Reorganization, was the stated attention. (**Exhibit 3**).  A question of internal control is to be decided by the state of incorporation. MCL 450.2002.  In the present case, that state is Wyoming.

208. The transfer from Zhang and Collette to Brown was negotiated and executed without the notice or opportunity to be heard necessary under Wyoming Law and therefore not valid.

209. This Court is empowered by is equitable and declarative powers to set aside the Transfer and declare all subsequent actions taken by Brown subsequent to the transfer be declared invalid.

<u>COUNT XIV (ALL PARTIES) INJUNCTIVE RELIEF</u>

**TRIAL BY THE JUDGE**

210. HPIL incorporates Paragraphs (1) to (209) above to the same extent as though fully set forth herein.

211.   The allegations presented herein demonstrate that none of the Defendants should be in any position involving public trust or the money of investors.   HPIL requests that each of the Defendants be enjoined from conducting any activity which is claimed to be on behalf of or  for the benefit of HPIL.

212.   The factors this Court must review when granting a request for injunctive relief are as follows: (1) whether the party seeking injunction has demonstrated a likelihood of success on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other interested parties; and (4) where the public interest lies.

213.   The factors weigh entirely in granting HPIL an injunction precluding Defendants from causing further harm.  This includes Zhang, who, as noted above,  is trying to again sell HPIL.   This criminal business model has to be addressed and dealt with appropriately.

## COUNT XV: (ALL PARTIES) DISGORGEMENT

**Trial by Jury**

214.   HPIL incorporates Paragraphs (1) to (213) above to the same extent as though fully set forth herein.

215.   HPIL is entitled to a judgment against all Defendants for any amount of money wrongfully taken from funds raised by HPIL and for the return of any HPIL shares or other property obtained as a result of the conduct as described above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court:

    A.  Award HPIL all compensatory, consequential, exemplary, punitive, and any other

        allowable damages to in an amount to be determined at trial;

    B.  Grant HPIL the requested declaratory and injunctive relief;

    C.  Award HPIL its costs and reasonable attorneys' fees; and

    D.  Grant HPIL such other relief as is just and proper.

## JURY DEMAND

    PURSUANT TO FED. R. CIV. P. 38 HPIL requests trial by jury on all issues so triable.

Respectfully submitted,

Date: August 24, 2023           /s/Daniel J. Lehman_____
                                    Daniel J. Lehman (P66126)
                                    The Law Offices of Daniel J. Lehman, PLLC
                                    Attorneys for Plaintiff
                                    32000 Northwestern Highway, Suite 128
                                    Farmington Hills, MI 48334
                                    (248) 882-3906
                                    dan@djlehmanlaw.com