**Exhibit 12: Notice of Civil Claim, <u>Brown</u> <u>and</u> <u>Driver v. Brown</u>, Supreme Court of British Columbia, File No. S220698, dated January 31, 2022**



SUPREME COURT
**OF BRITISH COLUMBIA**
**VANCOUVER REGISTRY**

No. S 220698

Vancouver Registry

JAN 31 2022



*In the Supreme Court of British Columbia*

Between

**ARTHUR BROWN AND CYRUS DRIVER**

Plaintiffs

and

**STEPHEN BROWN**

Defendant

## NOTICE OF CIVIL CLAIM

### This action has been started by the plaintiffs for the relief set out in Part 2 below.

If you intend to respond to this action, you or your lawyer must

- (a) file a response to civil claim in Form 2 in the above-named registry of this court within the time for response to civil claim described below, and

- (b) serve a copy of the filed response to civil claim on the plaintiff.

If you intend to make a counterclaim, you or your lawyer must

- (a) file a response to civil claim in Form 2 and a counterclaim in Form 3 in the above-named registry of this court within the time for response to civil claim described below, and

- (b) serve a copy of the filed response to civil claim and counterclaim on the plaintiff and on any new parties named in the counterclaim.

JUDGMENT MAY BE PRONOUNCED AGAINST YOU IF YOU FAIL to file the response to civil claim within the time for response to civil claim described below.

31JAN22  2202010  RISS     200.00
21422    S220698

9044211.5

**Time for response to civil claim**

A response to civil claim must be filed and served on the plaintiffs,

(a)    if you were served with the notice of civil claim anywhere in Canada, within 21 days after that service,

(b)    if you were served with the notice of civil claim anywhere in the United States of America, within 35 days after that service,

(c)    if you were served with the notice of civil claim anywhere else, within 49 days after that service, or

(d)    if the time for response to notice of civil claim has been set by order of the court, within that time.

## CLAIM OF THE PLAINTIFFS

***Part 1: STATEMENT OF FACTS***

**Parties**

1.    The Plaintiff, Arthur Brown (**"Arthur"**), is a businessman with an address for service at 2400 – 200 Granville Street, Vancouver, British Columbia.

2.    The Plaintiff, Cyrus Driver (**"Cyrus"**), is a businessman and accountant with an address for service at 2400 – 200 Granville Street, Vancouver, British Columbia.

3.    The Defendant, Stephen Brown (**"Stephen"** or the **"Defendant"**), is a businessman who resides at 1411 Chartwell Drive, West Vancouver, British Columbia.

**Background**

4.    Between 2017 and 2021, Arthur and Cyrus (collectively, the **"Plaintiffs"**) loaned significant funds to Stephen for investment purposes.

9044211.5

5.      Stephen induced the Plaintiffs to lend him the monies by making various representations as detailed below.

6.      The advances were covered by various written agreements and/or oral agreements as detailed below.

7.      In addition, Stephen promised Arthur certain equity interests in real property and shareholdings in certain companies, as described in more detail below.

8.      Between 2017 and 2021, the total principal amount advanced by Arthur to Stephen was in or about $1.2 million (the "**Arthur Loans**").

9.      Between April 2018 and June 2020, the total principal amount advanced by Cyrus to Stephen was in or about $557,000 (the "**Cyrus Loans**").

10.     To date, when approached by the Plaintiffs about repayment, Stephen induced the Plaintiffs to hold off on their demands and to advance additional funds by making additional representations.  At all times, Stephen has failed or refused to repay the amounts due and owing pursuant to the Arthur Loans and Cyrus Loans and/or fulfil the various promises made.

11.     On January 21, 2022, each Arthur and Cyrus issued a formal written demands to Stephen requesting payment of the Arthur Loans and the Cyrus Loans and fulfilment of the various promises made by Stephen, to no avail.

12.     As a result of the multiple breaches of contract and promises, along with fraudulent misrepresentations by Stephen, the Plaintiffs have suffered and continues to suffer loss and damages.

- 4 -

**Written Agreements**

*2017 Agreement*

13.   In around December 2017, Arthur began advancing funds to Stephen for investment purposes. Stephen induced Arthur to lend him the monies by making various representations regarding investment opportunities.

14.   On October 31, 2017, Arthur, as lender, and Stephen, as borrower, entered into an agreement (the "**2017 Agreement**") whereby Arthur agreed to loan Stephen $20,000 (twenty thousand dollars), repayable by December 20, 2017, with 10% per annum interest.  In order to induce Arthur to enter into the 2017 Agreement, Stephen agreed to assign 50% of all of his tech assets and ownership of Mofo Capital to Arthur. Stephen acknowledged that Mofo Capital was a corporate vehicle being used to invest in cryptocurrencies.

15.   In around early 2018, as agreed, Arthur provided $20,000 to Stephen.

16.   Contrary to the 2017 Agreement, Stephen did not repay the $20,000 by the maturity date of December 20, 2017.

17.   Notwithstanding a formal written demand by Arthur issued on January 21, 2022, Stephen has failed or refused to repay the amounts due and owing to Arthur or assign to Arthur 50% of all of his tech assets and ownership of Mofo Capital.

18.   As at January 31, 2022, the principal amount due and owing to Arthur is $20,000, plus interest under the 2017 Agreement.

19.   As a result of the breach of contract by Stephen under the 2017 Agreement, Arthur has suffered and continues to suffer loss and damages.

- 5 -

**2018 Promissory Note**

20.    In around 2018, the Plaintiffs agreed to advance funds to Stephen for investment purposes. Stephen represented to the Plaintiffs, that he was borrowing the funds from them to take advantage of cryptocurrency sales and other ventures.

21.    On July 17, 2018, the Plaintiffs, as lenders, and Stephen, as borrower, entered into a promissory note (the "**2018 Promissory Note**"). The promissory note provides, among other things, that:

    (a)    The Plaintiffs each agreed to loan Stephen and Stephen promises to pay the Plaintiffs the principal sum of $500,000 (five hundred thousand dollars), without interest payable on the unpaid principal.

    (b)    The principal amount is repayable following the Plaintiffs providing Stephen with written notice of demand.

    (c)    All costs, expenses and expenditures including, and without limitation, the complete legal costs incurred by the Plaintiffs in enforcing the 2018 Promissory Note as a result of any default by Stephen, will be added to the principal, then the outstanding balance, and will immediately be paid by Stephen.

    (d)    In the case of Stephen's default and the acceleration of the amount due by the Plaintiffs, all amounts outstanding under the 2018 Promissory Note will bear interest at 10% per annum from the date of demand until paid.

    (e)    If Stephen defaults in payment after demand for ten (10) days, the security will be immediately provided to the Plaintiffs and the Plaintiffs are granted all rights of repossession as a secured party.

22.    In order to induce the Plaintiffs to enter into the 2018 Promissory Note, Stephen provided the following security: 66% ownership in the following entities Mofo Capital

(GAMZ,PLYZ,CRYPTO3), Crypto Energy Partners, TugBall, Sedona Development of the Bahamas.

23.     Between around 2017 and 2021, Arthur loaned Stephen the principal amount of $1.2 million, by and through a series of bank transfers, wires and/or cheques.

24.     Between around 2018 and 2020, Cyrus loaned Stephen the principal amount of $560,000, by and through a series of bank transfers and/or cheques.

25.     On January 21, 2022, in accordance with the terms of the 2018 Promissory Note, the Plaintiffs issued Stephen a formal written demand for repayment of the amounts advanced.

26.     Stephen has not repaid the amounts owed to the Plaintiffs.

27.     In accordance with the terms of the 2018 Promissory Note, because Stephen defaulted in payment after demand for ten (10) days, the security should be immediately provided to the Plaintiffs and the Plaintiffs are granted all rights of repossession as a secured party.

28.     As at January 31, 2022, the principal amount due and owing to Arthur under the 2018 Promissory Note is $500,000, plus interest.

29.     As at January 31, 2022, the principal amount due and owing to Cyrus under the 2018 Promissory Note is $500,000, plus interest.

30.     As a result of the breach of contract by Stephen under the 2018 Promissory Note, the Plaintiffs have suffered and continue to suffer loss and damages, including, but not limited to, monies owed, expenses and legal fees incurred in enforcing the 2018 Promissory Note.

*2018 Hawaii Property Agreement*

31.     During 2018, Arthur supported Stephen by lending him monies to live on.

- 7 -

32.  On December 5, 2018, Stephen agreed in writing (the "**2018 Hawaii Property Agreement**") to provide Arthur with a 50% equity ownership of Stephen's property located at 4551 Aukai Avenue, Honolulu, United States (the "**Hawaii Property**").

33.  As at January 31, 2022, Stephen has not fulfilled his promises to provide Arthur with 50% of the Hawaii Property under the terms of the 2018 Hawaii Property Agreement.

34.  In around 2019, the Hawaii Property was sold to a third party, without Arthur's knowledge or consent, contrary to the terms of the 2018 Hawaii Property Agreement.

35.  As a result of the breach of promise by Stephen under the 2018 Hawaii Property Agreement, Arthur has suffered and continues to suffer loss and damages.

**2020 Agreement and Debt and Representation Acknowledgement**

36.  By around 2020, the Plaintiffs had each advanced considerable sums of money to Stephen between 2017 and 2020 for investment purposes under the agreements noted above and based on the representations made by Stephen.

37.  To memorialize the events and representations made by Stephen that had taken place since in or around 2017, Stephen and the Plaintiffs executed a written agreement on April 24, 2020  (the "**2020 Agreement**").

38.  In the 2020 Agreement:

    (a)  Stephen acknowledged that the Plaintiffs had advanced considerable sums of money to Stephen for investment purposes;

    (b)  Stephen acknowledged that he was contributing the same amounts to the investment that the Plaintiffs had advanced to Stephen;

    (c)  Stephen acknowledged that he would not be receiving remuneration;

    (d)  Stephen acknowledged that funds were advanced by the Plaintiffs to take advantage of cryptocurrency sales;

- 8 -

(e)    Stephen represented that the cryptocurrency investments resulted in net proceeds of $782,000 USD and that these funds were in a Citi Bank account (the **"Citi Bank Representation"**). The Citi Bank Representation was important to the Plaintiffs and induced them to continue to advance funds to Stephen. The Citi Bank Representation was not true;

(f)    Stephen represented that the funds advanced by the Plaintiffs were invested into an arena game called "Tugball". Stephen represented that a number of major investors, including various high-profile persons, were investing into this project (the **"Tugball Representations"**).   The Tugball Representations were important to the Plaintiffs and induced them to continue to advance funds to Stephen. The Tugball Representations were not true;

(g)    Stephen represented that another business venture was undertaken to form a union for the players of "Tugball" (into a company known as Pro Gamers Union NA Ltd.) to give them insurance and that AON Insurance was brought into assist with the insurance for the players. After many changes, Arthur and Cyrus were advised by Stephen that AON would purchase 40% of World Gaming Group for a consideration of 400,000 shares of AON (later reduced to 160,000). Arthur and Cyrus were advised by Stephen this was still forthcoming and the shares would be received imminently (the **"Insurance Representations"**). After many requests to Stephen, the agreement was still not been made available to the Plaintiffs.   The Insurance Representations were important to the Plaintiffs and induced them to continue to advance funds to Stephen. The Insurance Representations were not true;

(h)    Stephen represented to the Plaintiffs that a participation agreement had been made with Activision in connection with the marketing of these games and that Activision owes the Plaintiffs and Stephen $2.5 million USD with respect to their involvement with the percentage purchase of the first game "Bagdad Palace" (the **"Activision Representation"**). Despite several confirmations and assurances from

Stephen, to date, these funds still have not been received.   The Activision Representation was important to the Plaintiffs and induced them to continue to advance funds to Stephen.  The Activision Representation was not true;

(i)     Stephen advised and represented to the Plaintiffs that they all had purchased an offshore brokerage company in the Caribbean Islands (the "**Brokerage Representation**").   The Brokerage Representation was important to the Plaintiffs and induced them to continue to advance funds to Stephen.  The Brokerage Representation was not true;

(j)     Stephen represented to the Plaintiffs that he had made a further business venture in an "on-line gambling" business primarily operating in Europe that he had sold 12% to a UK doctor for 10 million GBP Sterling, which was currently earning interest in Coutts Bank in the United Kingdom (previously in a Barclays Bank account) (the "**UK Funds Representation**"). The UK Funds Representation was important to the Plaintiffs and induced them to continue to advance funds to Stephen.  Stephen has previously represented to the Plaintiffs that the funds were in a Barclays account. To verify the UK Funds Representation, Stephen gave the Plaintiffs a copy of the bank statement from Barclays showing 5 million GBP Sterling. The bank statement was not real and the UK Funds Representation was not true.  Despite repeated requests, Stephen has not produced a bank statement from Coutts verifying the UK Funds Representation;

(k)     Stephen represented to the Plaintiffs that there was a partnership with Lululemon to market a new clothing line for athletes (the "**Lululemon Representation**").  The Lululemon Representation was important to the Plaintiffs and induced them to continue to advance funds to Stephen.  The Lululemon Representation was not true;

(l)     Stephen represented to the Plaintiffs that he had negotiated take over control over a TSX company, formerly Wonderfilm, now known as Appreciated

Entertainment. Stephen is acting as the CEO and advised Arthur and Cyrus that they were to receive in excess of 30 million shares. To date, the shares have not been received;

(m)     Other business ventures were mentioned by Stephen and listed in the 2020 Agreement, including an association with the Kardashians, a lawsuit against Google for $5million USD, receiving cash from the sale of a Hawaiian property, selling a NASDAQ and UK shell company and Roundhill (the "**Business Representations**"); and

(collectively the Citi Bank Representation, the Tugball Representations, the Insurance Representations, the Activision Representation, the Brokerage Representation, the UK Funds Representation, the Lululemon Representation and the Business Representations will be referred to as the "**Representations**").

39.     Stephen made the Representations to the Plaintiffs fraudulently, to induce the Plaintiffs to continue lending him more monies, in that Stephen made them knowing them to be false or made it without belief in their truth or made them recklessly, not caring whether they were true or false.

40.     The Representations made by Stephen to the Plaintiffs, as memorialized in the 2020 Agreement were false, because at the relevant time:

(a)     The net sales of $782,000 USD have never been received by the Plaintiffs.

(b)     The investors, various high-profile persons, were not investing into the arena game called "Tugball".

(c)     AON did not purchase 40% of World Gaming Group and as a result, the shares were not received.

(d)     The participation agreement with Activision was not made and Activision did not owe the Plaintiffs and Stephen $2.5 million USD.

(e)    The Plaintiffs and Stephen did not purchase an offshore brokerage company in the Caribbean Islands as there is no proof to its existence.

(f)    There was no sale of 12% of an "on-line gambling" business to a UK doctor for 10 million GBP Sterling and as a result, no interest was being earned in any bank account from this alleged sale.

(g)    There was no partnership with Lululemon to market a new clothing line for athletes.

(h)    Stephen did take over control over a TSX company, formerly Wonderfilm, now known as Appreciated Entertainment but the Plaintiffs did not receive shares in excess of 30 million shares.

***Additional Representations***

41.    In addition to the Representations (detailed above), Stephen made additional representations to the Plaintiffs in around late 2019 to early 2020 fraudulently, to induce the Plaintiffs to continue lending him more monies, in that Stephen made knowing to be false or were made without the belief in their trust or made them recklessly, not caring whether they were true or false, as follows:

(a)    Stephen represented that certain shares would be purchased in World Gaming Group Ltd. resulting in fund being received by Plaintiffs as return on their investments;

(b)    Stephen promised he would deliver to Cyrus the accounting of all the companies that Stephen invested in using Plaintiffs funds by no later than May 29, 2019 and on several other occasions;

(c)    In connection with the UK Funds Representation, Stephen represented that the balance of the account at Coutts Bank was 10,461,000.12 GBP; and

(d)    In connection with the UK Funds Representation, Esports Gambling Ltd. was approved a Fintrac registration in Canada and the funds held in a bank account with Bank of Ireland would be wired to the Plaintiffs as recipients,

(collectively, referred to as the "**Additional Representations**").

42.    By reason of the Stephen's actions and/or omissions, including, but not limited to the fraudulent misrepresentations by way of the Representations and the Additional Representations, the Plaintiffs have suffered loss and damage.

***2020 Representations***

43.    In around 2020, Stephen induced the Plaintiffs to lend him further monies by making various representations about various investments that turned out to be false:

(a)    Stephen represented in writing that he would go to the United Kingdom on around December 20, 2020 to secure funds from a bank for an e-sports investment and transfer $1.5 million USD to each investment and $3 million USD to an e-sports CIBC bank account (the "**E-Sports Representations**"); and

(b)    Stephen represented in writing that World Gaming would vend into Crank Media by January 30, 2021 in exchange for shares (the "**Crank Media Representation**").

44.    Stephen made the E-Sports Representations and the Crank Media Representation to the Plaintiffs fraudulently in that Stephen made them knowing them to be false or made it without belief in their truth or made them recklessly, not caring whether they were true or false.

45.    By reason of the Stephen's actions and/or omissions including but not limited to the fraudulent misrepresentations, the Plaintiffs have suffered loss and damage.

- 13 -

*2021 Email Agreement*

46.  On March 31, 2021, Stephen, by email to Arthur (the **"2021 Email Agreement"**) agreed that:

    (a)  Stephen would ensure that Arthur would receive a minimum of $250,000 USD from the Distrokid/universal payment.

    (b)  Stephen would ensure that Arthur would participate in all financial transactions with Crank Media Inc. to get him more money as soon as possible.

    (c)  Stephen would cause Crank Media Inc. to issue a promissory note in the amount Arthur is satisfied with, or $500,000 USD.

    (d)  Stephen would provide Artur with 5 million shares in both Crank Media Inc. and Cybernetic Technologies.

47.  Stephen breached the 2021 Email Agreement by failing to perform the terms set out above.

48.  On January 21, 2022, Arthur issued a formal written demand to Stephen requesting him to fulfill the various promises made by Stephen under 2021 Email Agreement, to no avail.

49.  As a result of the breach of contract and promise by Stephen under the 2021 Email Agreement, Arthur has suffered and continue to suffer loss and damages.

*2021 Written Agreement*

50.  On August 19, 2021, Stephen and Arthur entered into a written agreement (the **"2021 Written Agreement"**) that provides:

    (a)  Stephen would provide Arthur with 5 million shares of Crank Media Inc. (in addition to the 5 million under the 2021 Email Agreement); and

(b)   Stephen would provide Arthur with 3 billion shares of HPIL in exchange for $44,000.

(c)   Stephen acknowledged that he owed Arthur $500,000.

(d)   Stephen would provide Arthur with fifty (50) million shares of Stargaze Entertainment.

51.   Stephen breached the 2021 Written Agreement by failing to perform the terms set out above.

52.   On January 21, 2022, Arthur issued a formal written demand to Stephen requesting him to fulfill the various promises made by Stephen under 2021 Written Agreement, to no avail.

53.   As a result of the breach of contract and promise by Stephen under the 2021 Written Agreement, Arthur has suffered and continues to suffer loss and damages.

*Implied Term of Good Faith*

54.   It was an implied term of all of the agreements detailed above that Stephen would act in good faith in relation to co-operating with the Plaintiffs to achieve the objects of the agreements and keep his promises, and to act in an honest, candid, forthright or reasonable manner in relation to those aspects of contractual performance.

55.   Between 2017 and 2021, the total principal amount advanced by Arthur to Stephen under the Arthur Loans was in or about $1.2 million.

56.   Between April 2018 and June 2020, the total principal amount advanced by Cyrus to Stephen under the Cyrus Loans was in or about $560,000.

57.   Stephen breached the implied term of the agreements, and, as a result, the Plaintiffs have suffered and continue to suffer loss and damages.

*Travel Expenses*

58.   In around 2019, Cyrus incurred travel expenses as a direct result of the breach of the various agreements and/or fraudulent representations made by Stephen.

59.   In around 2019, based on the representations made by Stephen, including but not limited to, the UK Funds Representations, the Plaintiffs booked travel to United Kingdom to collect the monies at Barclays Bank. This was cancelled because Stephen acknowledged that the banking was not ready and it would be a waste of time and money to travel . As a result, Cyrus incurred cancellation fees.

60.   In around , Cyrus took a trip to the United Kingdom, in reliance of the UK Funds Representation by Stephen, to verify whether there were in fact funds held in in Coutts Bank and/or in Barclays Bank in the United Kingdom.

61.   Cyrus paid for the travel expenses in the total amount of about $15,000.

*Meeting Expenses*

62.   Between around 2018 and 2019, Cyrus incurred meal expenses as a direct result of the breach of the various agreements and/or fraudulent representations made by Stephen.

63.   In 2018 and 2019, at the request of Stephen, the Plaintiffs met with Stephen at restaurants located in Vancouver, British Columbia.  At those meetings, Stephen induced the Plaintiffs to lend him further monies by making various representations about various investments that turned out to be false.

64.   Cyrus paid for the food and drink at the meetings with Stephen, in the total amount of about $1,200.

**Part 2: RELIEF SOUGHT**

1.   The Plaintiffs claim general damages.

- 16 -

2.      The Plaintiffs claim special damages, including loss of earning capacity.

3.      The Plaintiffs claim punitive damages.

4.      The Plaintiffs claim interest pursuant to the terms of the agreements between the Plaintiffs and Stephen, or in the alternative, pursuant to the Court Order Interest Act, R.S.B.C. 1996, c.79.

5.      The Plaintiffs seek the enforcement, transfer and assignment and/or distribution and delivery of the following:

(a)      the transfer and assignment of 50% of all Stephen's tech assets and ownership of Mofo Capital to Arthur, under the 2017 Agreement;

(b)      the enforcement of the security under the 2018 Promissory Note;

(c)      the transfer and assignment of 50% of the Hawaii Property to Arthur, under the terms of the 2018 Hawaii Property Agreement;

(d)      the delivery of a minimum of $250,000 USD from the Distrokid/universal payment to Arthur, under the 2021 Email Agreement;

(e)      the delivery and execution of the necessary documents required to ensure that Arthur would participate in all financial transactions with Crank Media Inc. under the 2021 Email Agreement;

(f)      the delivery and execution of the  Crank Media Inc. promissory note to Arthur,  in the amount Arthur is satisfied with, or $500,000 USD, under the 2021 Email Agreement;

(g)      the transfer and assignment of 10 million shares in both Crank Media Inc. and Cybernetic Technologies to Arthur, under the 2021 Email Agreement and the 2021 Agreement;

(h)     the transfer and assignment of 3 billion shares of HPIL in exchange for $44,000 to Arthur, under the 2021 Agreement;. and

(i)     the transfer and assignment of fifty (50) million shares of Stargaze Entertainment to Arthur, under the 2021 Agreement.

6.     The Plaintiffs claim costs, including complete legal costs incurred for enforcing the 2018 Promissory Note.

**Part 3:  *LEGAL BASIS***

***Fraudulent Misrepresentation***

7.     Stephen committed the tort of fraudulent misrepresentation.

8.     Between 2017 and 2021, the Plaintiffs advanced significant funds to Stephen for investment purposes. The total principal amount advanced by Arthur to Stephen under the Arthur Loans was in or about $1.2 million. The total principal amount advanced by Cyrus to Stephen under the Cyrus Loans was in or about $560,000.

9.     Stephen induced the Plaintiffs to lend him the monies by making various false representations as set out above, that the Plaintiffs relied upon.

10.     Stephen made the representations to the Plaintiffs fraudulently and Stephen made them knowing them to be false or made them without belief in its truth or made it recklessly, not caring whether it was true or false

11.     By reason of the Stephen's actions and/or omissions, the Plaintiffs have suffered loss and damage.

**Breach of Contract**

12.    Between 2017 and 2021, the Plaintiffs advanced significant funds to Stephen for investment purposes. The advances were covered by various written agreements and oral agreements as detailed above.

13.    In addition, Stephen promised Arthur certain equity interests in real property and shareholdings in certain companies, as described in more detail above.

14.    Stephen breached the various agreements by failing and/or refusing to repay the monies due and owing to the Plaintiffs, also by failing and/or refusing to keep his promises to the Plaintiffs.

15.    As a direct result of the multiple breaches of contract and promises by Stephen, along with fraudulent misrepresentations by Stephen, the Plaintiffs have suffered and continue to suffer loss and damages.

| | |
|---|---|
| Plaintiffs' address for service: | Patrick Sullivan<br>Whitelaw Twining Law Corporation<br>2400 – 200 Granville Street<br>Vancouver, BC   V6C 1S4 |
| Fax number for service (if any): | 604-682-5217 |
| Email address for service (if any): | psullivan@wt.ca; hsevenoaks@wt.ca |
| Place of trial: | Vancouver |
| The address of the registry is: | 800 Smithe Street<br>Vancouver, BC  V6Z 2E1 |

Dated: 31/Jan/2022

Signature of lawyer for the Plaintiffs
Patrick Sullivan

Rule 7-1(1) of the *Supreme Court Civil Rules* states:

1.    Unless all parties of record consent or the court otherwise orders, each party of record to an action must, within 35 days after the end of the pleading period,

    (a)    prepare a list of documents in Form 22 that lists

        (i)    all documents that are or have been in the party's possession or control and that could, if available, be used by any party at trial to prove or disprove a material fact, and

        (ii)    all other documents to which the party intends to refer at trial, and

    (b)    serve the list on all parties of record.

# APPENDIX

*[The following information is provided for data collection purposes only and is of no legal effect.]*

**Part 1: *CONCISE SUMMARY OF NATURE OF CLAIM:***

The Plaintiffs claim against the Defendant is for damages for breach of contract.

The Plaintiffs' claim against the Defendant for damages for fraudulent misrepresentation.

**Part 2: *THIS CLAIM ARISES FROM THE FOLLOWING:***

A personal injury arising out of:

☐    a motor vehicle accident

☐    medical malpractice

9044211.5

☐  another cause

A dispute concerning:

☐  contaminated sites

☐  construction defects

☐  real property (real estate)

☐  personal property

☐  the provision of goods and services or other general commercial matters

☐  investment losses

☐  the lending of money

☐  an employment relationship

☐  a will or other issues concerning the probate of an estate

☐  a matter not listed here

**Part 3:  *THIS CLAIM INVOLVES:***

☐  a class action

☐  maritime law

☐  aboriginal law

☐  constitutional law

☐  conflicts of law

☐  none of the above

9044211.5

☐    do not know

***Part 4:***

9044211.5