UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

HPIL HOLDING, INC.,

                Plaintiff,

v.                                              Case No. 1:23-cv-12050

HAINING ZHANG, et al.,                Honorable Thomas L. Ludington
                                                United States District Judge

                Defendants.

_____/

**OPINION AND ORDER DISMISSING PLAINTIFF'S COMPLAINT FOR LACK OF
SUBJECT MATTER JURISDICTION AND DENYING PENDING MOTIONS AS MOOT**

At its core, this case concerns a power struggle between Christopher Philbrick and Stephen Brown to control a twenty-year-old company, HPIL Holding, Inc (HPIL). Confusion has plagued this struggle at every turn. At best, this confusion is attributable to twenty years of complex corporate history impacted by protracted state court proceedings. At worst, it is attributable to all Parties speaking past one another and presenting self-serving, conclusory narratives to further potential fraud.

HPIL is somewhat of an apparition. It has never had any legitimate business operations. Its public financial filings suggest it has never realized meaningful profits. It has largely survived as a going concern through promissory note funding from various investors, swelling its liabilities to over ten million dollars. Yet, in 2020, HPIL was seemingly defunct and Defendant Haining Zhang—a minority shareholder—filed receivership proceedings in the 42nd Circuit Court seeking to appoint his friend, Defendant Angela Collette, as HPIL's receiver to rehabilitate the company. For reasons unknown, Zhang did not properly serve HPIL in its state of incorporation. But the improper service was initially not known to Midland Circuit Judge Stephen Carras, who granted Zhang a default judgment after HPIL did not appear or respond, and appointed Collette as HPIL's

receiver. In April 2021, Collette entered into an agreement with Defendant Stephen Brown—a Canadian citizen—appointing him to serve as HPIL's CEO.

Five months later, three other purported HPIL shareholders—Christopher Philbrick, Ray Wong, and Frank Dougherty—intervened in the Midland Receivership proceedings and sought to set aside the default judgment because HPIL was not properly served. In November 2021, Judge Carras dismissed Zhang's receivership complaint for the same reasons but did not vacate Collette's decisions and actions in the year she served as HPIL's receiver, including her appointment of Stephen Brown as CEO. Philbrick and his fellow intervenors then filed derivative counterclaims in the Midland Circuit Court on HPIL's behalf against Zhang, Collette, and Brown, alleging all three defrauded the state court and HPIL shareholders. But in April and June 2023, Judge Carras dismissed all derivative counterclaims because Philbrick, Wong, and Dougherty were not continuous HPIL shareholders throughout the receivership proceedings, and, even if they were, they did not file a written demand on CEO Brown or any other HPIL director. Judge Carras also rejected Philbrick's argument that he–not Brown—was HPIL's CEO, such that he need not comply with the shareholder derivative demand requirement.

Philbrick wants another bite of the apple in federal court, and attempts to mask his second serving by filing the complaint in HPIL's name rather than his own. But this lawsuit in HPIL's name is only proper *if* Philbrick has the authority to act on HPIL's behalf. The state court repeatedly held that he does not. So *Rooker-Feldman* divests this court of jurisdiction to consider Philbrick's de facto appeal.

## I.

Plaintiff HPIL Holding, Inc. (HPIL) is a holding company incorporated in Wyoming. Plaintiff's operative, consolidated complaint is best considered in two parts. Part one concerns

receivership proceedings in the 42nd Circuit Court in Midland, Michigan, where Plaintiff alleges that Defendants Haining Zhang and Angela Collette conspired to initiate in 2020 and fraudulently influenced throughout 2023, resulting in Collette being appointed to serve as HPIL's receiver. Part two concerns an alleged "pump and dump" scheme orchestrated *after* HPIL's receivership and rehabilitation, in which Plaintiff alleges Canadian resident Defendant Stephen Brown—along with his associates and affiliated entities—deprived HPIL shareholders of nearly three million dollars. But these allegations cannot be fully understood without first understanding HPIL's history. Admittedly, the following background is confusing. The Parties' pleadings have not provided clarity. So the following facts pull heavily from public financial filings, which serve as more neutral narrators.

### A. HPIL's Origins

HPIL's story begins in 2004 in Delaware, where Anju Tandon incorporated "TNT Designs, Inc." (TNT), a fashion company focused on marketing and distributing "scarves, handbags, and other products from India." TNT Designs Inc., Current Report (Form 8-K) (May 16, 2007). Tandon served as TNT's CEO—and sole officer, director, and member—from its inception until mid-2009. *See* TNT Design Inc., Comment Letter (May 6, 2005). But TNT did little, if any, business during these five years. Indeed, its public SEC filings reflect that, in late 2009, it was still "a 'blank check' . . . development stage company" with "no specific business plan or purpose." TNT Designs Inc.,

Quarterly Report (Form 10-Q) (Aug. 19, 2009). Yet shares of TNT common stock were publicly traded on the over-the-counter[1] (OTC) market.[2]

Enter Louis Bertoli. On June 16, 2009, Bertoli purchased 86% of TNT's common "penny" stock shares for $173,130. TNT Designs Inc., Current Report (Form 8-K) (June 16, 2009). As a result, Bertoli became TNT's majority shareholder and was elected TNT's Chairman, CEO, and President. *See id.* At an annual shareholder meeting on October 7, 2009, a majority of TNT shareholders approved a Merger Agreement with Trim Nevada, Inc. *See* TNT Designs Inc., Current Report (Form 8-K) (October 14, 2009); *see also* ECF No. 1-2 at PageID.59–70 (Articles of Merger and Amended Articles of Incorporation). It seems Trim Nevada, Inc. was a "blank check" company, too, because this merger did not "change . . . TNT's business, management, . . . assets, liabilities, or net worth." *See id.* Indeed, TNT's management publicly reported the merger was intended only to change TNT's corporate domicile "from Delaware to Nevada." *Id.*

---

[1] The OTC market differs from traditional stock markets like the New York Stock Exchange. The OTC is decentralized and "essentially anonymous." *Fridrich v. Bradford*, 542 F.2d 307, 309, n. 5 (6th Cir. 1976). Instead of a physical marketplace, all trades of OTC securities—sometimes referred to as "penny stocks" or "pink sheets"—occur on the electronic OTC Bulletin Board (OTCBB). *See Over-the-Counter Market*, U.S. SEC. AND EXCH. COMM'N, https://www.sec.gov/about/divisions-offices/division-trading-markets/over-counter-market (last updated May 9, 2013). "OTC markets are generally less transparent and less regulated than traditional stock exchanges, which makes them potentially risker to invest in." *OTC Stocks and OTC Markets*, CHARLES SCHWAB, https://www.schwab.com/stocks/understand-stocks/otc-markets (last visited March 12, 2025) [https://perma.cc/QR74-3TXH].

[2] HPIL is currently designated as "caveat emptor" or "buyer's beware" on the OTCBB. *See* HPIL Holding, OTC MARKETS, https://www.otcmarkets.com/stock/HPIL/overview (last visited Mar. 14, 2025) [https://perma.cc/5G35-EQPN]. This designation applies to companies that (1) engage in "misleading or manipulative" stock promotion, (2) engage in "fraudulent or other criminal activity," or (3) provide insufficient public information to explain their corporate conduct. *Id.* A company may also be designated as caveat emptor when the OTC Markets Group or other regulatory agencies conclude "there is a public interest concern" regarding its securities, such as "unusual or unexplained trading activity" or "spam" actions. *Id.*

But on October 21, 2009, the newly merged "Trim Holding Group" announced it would begin to focus its business on "the Health Care and Environmental Quality Sectors." Trim Holding Group, Current Report (Form 8-K) (Oct. 21, 2009). Quite a switch from handbags and scarves. *See* Trim Holding Group, Registration Statement (Form S-1) (Jan. 7, 2010) (conceding Trim Holding's management had no training or experience "in running a business in the Health Care and Environmental Quality sector[s]"). In December 2009, Trim Holding purchased a patent for a "personal massaging device." Trim Holding Group, Current Report (Form 8-K) (Dec. 31, 2009); Trim Holding Group, Quarterly Report (Form 10-Q) (Aug. 4, 2010). Yet the Company never produced the device or otherwise utilized their patent rights. In April 2012, the Company reported a net loss of $876,533 since its inception. Trim Holding Group, Annual Report (Form 10-K) (Apr. 13, 2012).

On May 22, 2012, Trim Holding Group announced it would change its name to "HPIL Holding, Inc." to "more fully reflect its current business operations." HPIL Holding Inc., Current Report (Form 8-K) (May 22, 2012). Two months later, HPIL purchased a "portfolio of patent[] rights" concerning another "massage vibrator for pain relief" (the "IFLOR Device"). *See* HPIL Holding Inc., Current Report (Form 8-K) (July 5, 2012).

Another radical shift in HPIL's complex corporate history came in September 2012. Consistent with a new mission to focus on general "miscellaneous investing," HPIL Holding Inc., Current Report (Form 8-K) (July 23, 2012), HPIL announced the formation of the following six subsidiaries, each focused on investing in a specific industry:

1. HPIL Healthcare, Inc.;
2. HPIL Energytech, Inc.;
3. HPIL Worldfood, Inc.;
4. HPIL Real Estate, Inc.;
5. HPIL Globalcom, Inc.; and
6. HPIL Art & Culture, Inc.

HPIL Holding Inc., Current Report (Form 8-K) (Sept. 14, 2012). Throughout the next few years, each of these subsidiaries entered into superficial "cooperation agreements" with various third parties and received promissory-note investments which funded HPIL as a going concern but only increased the Company's liabilities. *See, e.g.*, HPIL Holding Inc., Quarterly Report (Form 10-Q) (Nov. 19, 2013) (noting HPIL had "yet to commence operations" but lost $1,544,461 since inception); HPIL Holding Inc., Annual Report (Form 10-K) (Apr. 15, 2014) (reporting $2,082,044 net loss since inception). This subsidiary structure was short-lived and, in May 2015, HPIL merged all subsidiaries back into the parent Company. HPIL Holding Inc., Current Report (Form 8-K) (May 28, 2015)

One transaction played a particularly prominent role in HPIL's history. It had nothing to do with healthcare, energy, food, real estate, communications, the environment, or art. It concerned Swiss karate. In December 2014, HPIL entered into a "Brand Licensing Agreement" with the "World Traditional Fudokan Shotokan Karate-Do Federation" (WTFSKF) based in Switzerland. *See* HPIL Holding Inc., Current Report (Form 8-K) (Dec. 30, 2014). Under the terms of this agreement, HPIL issued 752,000 shares of its common stock to WTFSKF in exchange for the exclusive right to sell WTFSKF merchandise through 2042. *Id.* HPIL quickly put whatever "eggs" it had in the WTFSKF "basket" and announced this Brand Licensing Agreement was the Company's main focus moving forward. HPIL Holding Inc., Quarterly Report (Form 10-Q) (Aug. 31, 2016); *see also* HPIL Holding Inc., Quarterly Report (Form 10-Q) (Apr. 2, 2018) (describing the Brand Licensing Agreement as the "concentration of the Company"). But, to date, it appears HPIL has not sold any karate merchandise. To the contrary, it appears the Brand Licensing Agreement only expedited HPIL's financial decline. When the parties signed the Brand Licensing Agreement in 2014, HPIL estimated—based on unidentified and unclear metrics—that the market

value of each common stock share was $9.05, such that the purchase price of the agreement was $6,805,600. *Id.* Two and a half years later, HPIL reported this agreement was "impaired" because the price of its common stock plummeted to $0.01 per share, such that it lost $6,798,080 due to the Brand Licensing Agreement's depreciation. HPIL Holding Inc., Quarterly Report (Form 10-K) (July 27, 2017).

Enter Nitin Amersey. On March 6, 2017, CEO Bertoli sold 36 million of his 43.2 million shares of HPIL common stock to Nitin Amersey—HPIL's then CFO—for $344,160. HPIL Holding Inc., Current Report (Form 8-K) (Mar. 6, 2017). As a result, Amersey owned a majority (70.65%) of HPIL's common stock. *Id.* Notably, one month later, the SEC permanently enjoined Amersey from being associated with any securities transfer agent, broker, dealer, or advisor because of his conduct with a transfer agent based in Bay City, Michigan. *See* HPIL Holding Inc., Quarterly Report (Form 10-Q) (Aug. 25, 2017); *see also* ECF No. 39 at PageID.2108. Yet, in October 2017, Bertoli resigned, and HPIL's remaining directors appointed Amersey as its CEO and President and allowed him to retain his role as CFO. HPIL Holding Inc., Current Report (Form 8-K) (Oct. 17, 2017). Despite these significant shuffles in its management and mission, HPIL reported in April 2018 that it still had not commenced any "substantial operations" since its inception in 2004 and reported an additional $1,930,902 loss throughout FY 2017.  HPIL Holding Inc., Quarterly Report (Form 10-Q) (Apr. 2, 2018).

Under CEO Amersey, HPIL resumed its pattern of purchasing unrelated entities and engaging in sporadic transactions. In March 2018, HPIL entered into an agreement to market a crypto coin. HPIL Holding Inc., Current Report (Form 8-K) (Mar. 29, 2018). In August 2018, HPIL purchased a small company called "MyFlyWiFi" from Ray Wong for $35,000. *See* HPIL Holding Inc., Current Report (Form 8-K) (Aug. 30, 2018). In October 2018, HPIL purchased a

small drilling parts company called "RodDoc," along with its patented "spiral banding" drilling rod from owners Christopher Philbrick and Frank Dougherty, in exchange for 350,000,000 shares of HPIL common stock, then valued at $.0001 per share. *See* HPIL Holding Inc., Current Report (Form 8-K) (Oct. 18, 2018); *see also* HPIL Holding Inc., Current Report (Form 8-K) (Mar. 12, 2019).

HPIL's corporate filings were just as sporadic as its business under CEO Amersey's leadership. In 2019, HPIL ceased its voluntary reporting to the SEC. *See* HPIL Holding Inc., Suspension of Duty to File Reports Under Sections 13 and 15(d) of the Securities Exchange Act of 1934 (Form 15) (Aug. 12, 2019). HPIL filed its last public report in Nevada in February 2019, and was later dissolved by the Nevada Secretary of State. *See Silver Flume Nevada's Business Portal: HPIL Holding*, https://esos.nv.gov/EntitySearch/BusinessFilingHistoryOnline (last visited Mar. 13, 2025) [https://perma.cc/V4UF-FNRM]. In March 2019, for reasons unknown, HPIL filed Articles of Continuance in Wyoming. *See* ECF No. 1-2 at PageID.50–52. But litigation in Midland, Michigan further muddied these already opaque waters.

### B. Midland Receivership Proceedings

In late 2019 and early 2020, from a shareholder's perspective, HPIL was "dead as a doornail." William Shakespeare, Henry VI Part II, act 4, sc. 10, l. 42. It was dissolved in Nevada. Although it filed articles of continuance in Wyoming, it engaged in no apparent business and did not file any public reports there. It had accumulated millions of dollars in deficits and reported "losses at each reporting period" since its inception in 2004. HPIL Holding Inc., OTC 2019 Annual Report (January 20, 2022). Yet Defendant Haining Zhang—a Pennsylvania resident and minor HPIL shareholder—had hope. On April 13, 2020, Zhang filed a *pro se* complaint in Michigan's 42nd Circuit Court in Midland County, seeking to appoint Angela Collette—an attorney authorized

to practice in New York, Michigan, and Kentucky—as HPIL's receiver under MICH. COMP. LAWS § 450.1851.[3] ECF No. 4-1; *see also* ECF No. 27 at PageID.1608, 1612–13. As aptly described by Midland Circuit Judge Stephen Carras, the receivership proceedings detailed below were "a bit of a mess." ECF No. 10-5 at PageID.1429.

## 1. Receivership Complaint

Generally, Zhang's receivership complaint alleged that HPIL was defunct and needed rehabilitation. ECF No. 4 at PageID.769–73. Zhang alleged that he attempted to contact HPIL directors and officers but could not locate them and received no response. *Id.* Zhang also alleged that HPIL's management had "abandoned the company," did not hold annual meetings, and was wasting resources at the expense of shareholders in breach of its fiduciary duties. *Id.* Critically, Zhang's April 2020 receivership complaint focused on HPIL's dissolution in *Nevada* and did not discuss HPIL's continuance to *Wyoming*. *See* ECF No. 4-1 at PageID.770. Accordingly, Zhang attempted to serve the receivership complaint on HPIL's defunct Nevada address instead of the Wyoming address or registered agent HPIL had used for nearly a year.[4] *See* ECF No. 53-1 at PageID.2451, 2513, 2519. Zhang also alleged that Collette was "well suited" to serve as HPIL's

---

[3] Under this statute, when a company "has been dissolved in any manner," the company itself, or any creditor or shareholder, may "apply . . . to the circuit court of the county in which the principal place of business or registered office of the corporation is located for a judgment that the affairs of the corporation and the liquidation of its assets continue under the supervision of the court." MICH. COMP. LAWS § 450.1851(1). And the statute allows the court to "make orders and judgments as may be required" to rehabilitate the company, "including, but not limited to, . . . the appointment of a receiver . . . to be vested with powers as the court designates to liquidate the affairs of the corporation." *Id.* Although HPIL was dissolved in Nevada and continued to Wyoming, its principal place of business at the time Zhang initiated the receivership proceedings was Midland, Michigan, so venue was proper in the Midland Circuit Court. *See* HPIL Holding Inc., Current Report (Form 8-K) (March 15, 2019).

[4] Zhang maintains he did not know about HPIL's Wyoming continuance until "after the receivership order was put in place" and argues—without explanation—that this continuance was otherwise "ineffective." ECF No. 44 at PageID.2150, n. 5.

receiver because she had "over 20 years of experience" in criminal and corporate matters, and had significant "capability and corporate exposure." *Id.* at PageID.769, 771. On this point, Collette noted she and Zhang "ha[d] a mutual acquaintance who introduced [them] several years ago." ECF No. 27 at PageID.1620.

Plaintiff sees things differently, and alleges Zhang and Collette were in cahoots. Plaintiff alleges they had no genuine intention to rehabilitate HPIL and, instead, are serial filers who seek to exploit corporations through fraudulent receivership proceedings. *See* ECF No. 4 at PageID.732 (alleging (1) "Zhang has filed at least twenty complaints seeking to have a receiver . . . appointed over a corporation for the purpose of gaining control over these corporations to exploit the[m] for legally prohibited purposes[;]" and (2) "Collette has been appointed receiver or custodian, or has orchestrated the appointment of a receiver or custodian, on at least twenty occasions for the purpose of gaining control over these corporations to exploit the[m] for legally prohibited purposes").

Regardless, the Wyoming Secretary of State administratively dissolved HPIL for delinquent tax filings one month after Zhang filed his April 2020 receivership complaint in the Midland Circuit Court. ECF No. 4-21 at PageID.1014; *see also* Wyo. Stat. Ann. §§ 17-16-1420, 17-16-1421 (2022). So, for the next few months, HPIL had no home, and did not exist as a corporate entity.

### 2. Default Judgment, Rehabilitation, & Reorganization

Likely because Zhang served HPIL in Nevada instead of Wyoming, HPIL did not respond to the receivership complaint or otherwise appear. *See* ECF No. 4-22 at PageID.1017. So, on September 11, 2020, Judge Carras entered a default judgment in Zhang's favor and appointed Angela Collette as HPIL's receiver. *Id.* at PageID.1018. Collette sought HPIL's reinstatement as

a Wyoming corporation one week later. ECF No. 4-21 at PageID.1014. And the Wyoming Secretary of State officially reinstated HPIL's corporate charter on October 14, 2020. *Id.* at PageID.1015.

After HPIL was reinstated, Plaintiff alleges that Collette and Zhang diluted HPIL's shares to present it as a reverse-merger target. ECF No. 4 at PageID.731. "A reverse merger, generally, is a way for private companies to go public, and often involves a private company acquiring the majority shares of a public company—like HPIL—which then serves as the private company's shell." *HPIL Holding, Inc. v. Zhang*, 734 F. Supp. 3d 664, 674 (E.D. Mich. 2024) (internal quotations and citation omitted). "Reverse mergers are often attractive for private companies that want to publicly trade without raising start-up capital and going through the initial public offering process." *Id.*

Enter Defendant Stephen Brown—a Canadian citizen and the sole owner of Cybernetic Technologies, Ltd ("Cybernetic"). *See* ECF No. 4–3. On April 7, 2021, Zhang and Collette entered an "Agreement and Plan of Reorganization" ("Reorganization Agreement") on HPIL's behalf with Cybernetic. *See id.* Although Collette contends she does not know Brown and the Agreement did not personally involve Brown, ECF No. 27 at PageID.1617–18, both Collette and Brown signed the Agreement, and it appears that both initialed each page of the Agreement simultaneously. *See* ECF No. 4-3. And although Zhang maintains he has never met Brown in person, the record suggests he met Brown over the phone *before* the Midland Receivership Proceedings because Zhang conceded he initiated those proceedings, in part, because Brown had "promising . . . plan[s]" for HPIL's future. ECF Nos. 27 at PageID.1621–22; 39 at PageID.2120. Beyond these few facts, it remains unclear how Zhang, Collette, and Brown knew each other and came to an agreement regarding HPIL's reorganization.

Zhang, Collette, and Brown's April 2021 Reorganization Agreement transferred 92% of HPIL's shares to Cybernetic. ECF No. 4-3 at PageID.841; *see also* ECF No. 4 at PageID.731. Zhang retained 4% of HPIL's shares, Collette retained 2% of HPIL's shares, and the remaining 2% of HPIL shares were left for "non-affiliated shareholders." ECF No. 4-3 at PageID.840. Critically, the Reorganization Agreement also provided that Brown would serve as HPIL's President and CEO, *id.* at PageID.844, and that Collette and Zhang would each receive $25,000. *Id.* at PageID.840. At some point after being appointed CEO, Brown appointed David Postula to serve as HPIL's President. *See* ECF No. 4 at PageID.732.

On May 17, 2021, Collette filed a final report and account with the Midland Circuit Court. ECF No. 4-4. In this report, Collette confirmed Brown's appointment and requested to resign as receiver because "a suitable board ha[d] been appointed and HPIL ha[d] been fully rehabilitated." *Id.* at PageID.849. Throughout the next few months, Brown engaged in numerous transactions as HPIL's CEO, *see* ECF No. 4 at PageID.733–45, and his CEO title was reflected in HPIL's public financial filings. *See, e.g.*, HPIL Holding Inc., Current Report (Form 8-K) (July 1, 2021); HPIL Holding Inc., Current Report (Form 8-K) (Sept. 27, 2021); HPIL Holding Inc., Current Report (Form 8-K) (Oct. 7, 2021). But a power-struggle was brewing on the horizon.

### 3.   Intervention, Dismissal, & Derivative Counterclaims

Remember Christopher Philbrick, Frank Dougherty, and Ray Wong? Philbrick and Dougherty owned the "RodDoc" drilling parts company that HPIL purchased in October 2018 in exchange for HPIL shares. *See supra* Section I.A. And Wong owned "MyFlyWiFi" before HPIL purchased it from him in August 2018, also in exchange for HPIL shares. *See id.* On September 1, 2021, *nearly one year after* Judge Carras granted a default judgment and appointed Collette as HPIL's receiver, Philbrick, Dougherty, and Wong filed a motion to intervene in the receivership

proceedings to argue that HPIL was never properly served, so the default receivership should be dismissed. ECF No. 4 at PageID.728; *see also* ECF No. 4-27 at PageID.1112. It is entirely unclear what Philbrick, Wong, and Dougherty were doing before attempting to intervene and why they waited nearly two years to do so. Notably, these three intervenors were represented by "HPIL's" Counsel in this federal case, attorney Daniel Lehman. *See id.*

On September 10, 2021, Judge Carras granted the motion to intervene, set aside the default judgment, and re-opened proceedings. *See Zhang v. HPIL Holding*, 2020-6979-CB (42nd Circuit Court, Midland County, MI, Sep. 10, 2021). Two months later, on November 9, 2021, Judge Carras dismissed Zhang's receivership complaint for lack of proper service. *See* ECF No. 4-27; *see also* ECF No. 10-1 at PageID.1197 (noting the receivership complaint was dismissed because HPIL's "Wyoming registered agent . . . should have been served"); 37-5 at PageID.2070 (noting "service was not proper").

Importantly, although Judge Carras dismissed Zhang's receivership complaint, the Midland Circuit Court did *not* vacate any of Collette's actions during the year she served as HPIL's appointed receiver—including her agreement appointing Stephen Brown as HPIL's President and CEO—because the intervenors did not seek this relief.[5] *See* ECF No. 10-4 at PageID.1404 ("I

---

[5] Notably, receivers like Angela Collette "act[] as an 'arm of the court' and thus enjoy[] quasi-judicial immunity" in subsequent suits so long as they do not act corruptly, maliciously, or outside the authority of the applicable court order. *Davis v. LifeTime Cap., Inc*., 740 F. App'x 820, 829 (6th Cir. 2018) (collecting cases); *see also Davis v. Bayless*, 70 F.3d 367, 373 (5th Cir. 1995) ("Court appointed receivers . . . are entitled to share the appointing judge's . . . immunity provided that the challenged actions are taken in good faith and within the scope of the authority granted to the receiver."); *Micha US LLC v. Benchmark Healthcare Consultants LLC*, No. 21-12573, 2022 WL 2867183, at *4 (E.D. Mich. July 20, 2022) ("In order to overcome this immunity, [p]laintiffs must plausibly allege gross negligence, gross or willful misconduct, malicious acts and/or failure to comply with th[e] [c]ourt's orders." (internal quotations omitted)). This quasi-immunity makes sense. The "avalanche of suits" that would result absent immunity would have a chilling effect and would "provide powerful incentives" for receivers to refrain from acting to rehabilitate or assist the relevant corporation. *Trinh v. Fineman*, 9 F.4th 235, 238 (3d Cir. 2021).

think it was two years ago . . . when you filed a motion to set aside the default, which was granted [be]cause service was improper. Right? And you submitted the order as a result of that, but you didn't at that time ask for Mr. Brown or anybody else to be removed as" HPIL Directors. "[S]o, the issue is, at the time, there was no change. Right? There was . . . nothing in your order requesting a change in who was in charge of HPIL[.]").

Judge Carras also granted Philbrick, Wong, and Dougherty leave to file derivative counterclaims on HPIL's behalf against Zhang, Collette, and Brown. ECF No. 4-27. Although no Party provided this Court with a copy of the counterclaims, the record suggests they generally alleged—like the instant federal Complaint—that Zhang, Collette, and Brown engaged in a scheme to fraudulently obtain control of HPIL and "increase the value of HPIL's shares [to] sell . . . at an inflated price." ECF No. 5 at PageID.1129; *see also* ECF No. 14-1 at PageID.1468 (describing the counterclaim as alleging "six causes of action," including "disgorgement," "misfeasance of a public official," "fraud on the court," and "abuse of lawful process").

But, on April 28, 2023, Judge Carras *dismissed* the derivative counterclaims against Zhang and Collette with prejudice because (1) despite prior purchase agreements, Philbrick, Dougherty, and Wong were not continuous HPIL shareholders throughout the receivership proceedings, *see* WYO. STAT. ANN. § 17-16-741 (2024); and (2) they did not file a written demand with CEO Brown or any other post-receivership HPIL director, *see* WYO. STAT. ANN. § 17-16-742 (2024).[6] ECF No.

---

[6] Under applicable Wyoming law, a shareholder "may not commence or maintain a derivative" claim unless they (1) were "a shareholder of the corporation at the time of the act or omission complained of, or became a shareholder through transfer by operation of law from one who was a shareholder at the time," and (2) "[f]airly and adequately represent[] the interests of the corporation[.]" WYO. STAT. ANN. § 17-16-741 (2024). Additionally, "[n]o shareholder may commence a derivative proceeding until: (1) [a] written demand has been made upon the corporation to take suitable action; and (2) [n]inety . . . days have expired from the date the demand was made unless the shareholder has earlier been notified that the demand has been rejected by the

14-1 at PageID.1458.

Philbrick and the other intervenors asserted two arguments to the contrary. Judge Carras rejected both. First, Philbrick and the other intervenors argued that, because the receivership complaint was dismissed for improper service, Collette's appointment and actions were void, so Stephen Brown "was not" HPIL's CEO. ECF No. 14-1 at PageID.1474. Relatedly, the intervenors seemed to suggest that Nitin Amersey, the undisputed CEO *before* HPIL was dissolved and *before* the receivership proceedings began, appointed *Philbrick* as HPIL's CEO, such that the counterclaims weren't really "derivative," and no written demand was required. *Id.* at PageID.1475, 1477 ("Mr. Philbrick's been appointed to be the[] . . . CEO . . . So, we . . . believe . . . that there is no need for this demand requirement.").

Judge Carras rejected these arguments because (1) Attorney Lehman sent Brown a letter on Philbrick, Wong, and Dougherty's behalf in July 2021 recognizing Brown's authority as HPIL's CEO and demanding he issue Philbrick, Wong, and Dougherty the shares they were promised in prior purchase agreements, *id.* at PageID.1474–75 (referring to ECF No. 32-7 at PageID.1772–73); and (2) the intervenors never "ask[ed] for Mr. Brown or anyone else to be removed" from HPIL's board when the sought to dismiss the receivership complaint and, since then, "the business ha[d] been operating under Mr. Brown's apparent authority for . . . two years." *Id.* at PageID.1474–75; 1487–88. Although not squarely raised by the intervenors, Judge Carras further found that the futility exception to the derivative demand requirement did not apply. *Id.* ("There's been no showing that [a written demand] would be futile, there's no showing that it was impossible. . . . it's a harsh reality, but that's it. You cannot maintain a derivative action without having complied

---

corporation or unless irreparable injury to the corporation would result by waiting for the expiration of the ninety . . . day period." WYO. STAT. ANN. § 17-16-742 (2024).

with the statutes that are precedent to it."). And, two months later, for the same reasons, Judge Carras granted summary disposition in favor of Brown and dismissed the derivative counterclaim against him, too. ECF No. 10-5 at PageID.1416 (noting Philbrick, Wong, and Dougherty "d[id]n't have standing" under WYO. STAT. ANN. § 17-16-741 (2024) and were thus "precluded from brining the derivative action").

Philbrick and the intervenors sought narrow reconsideration of Judge Carras's conclusion that Philbrick and Dougherty were not continuous HPIL Shareholders.[7] *See* ECF No. 18-2. But it is unclear whether their motion was timely. The motion itself reflects that it was served on July 6, 2023. *See* ECF No. 18-2 at PageID.1543. But the state court docket reflects it was filed one day later, on July 7, 2023. *See Zhang*, 2020-6979-CB (July 7, 2023). This day makes a difference. Under the Michigan Court Rules, motions for reconsideration "must be served *and filed* no[] later than 21 days after the" challenged decision. Mich. Ct. R. 2.119(F)(1) (emphasis added). Judge Carras dismissed the counterclaims against Brown on June 15, 2023. *See* ECF No. 10-5 at PageID.1429. So the intervenors' deadline to serve *and file* their motion for reconsideration was July 6, 2023. It appears the Midland Circuit Court considers the motion untimely because it has not decided or otherwise responded to this nearly two-year-old motion, and the docket identifies the case is closed. *See Zhang*, 2020-6979-CB (June 15, 2023).

### C. Federal Procedural Posture

So Philbrick ran to federal court. But he hid his tracks by filing a complaint in HPIL's name, rather than his own. *See* ECF Nos. 1; 3; 4. In August 2023, "HPIL" asserted fifteen counts against ten Defendants. *See generally* ECF No. 4. This Court initially dismissed five of the

---

[7] Even if Judge Carras erred in concluding the intervenors were not continuous shareholders, his ultimate conclusion that the intervenors did not file a written demand on HPIL's board remains sound and unchallenged. *See* ECF Nos. 14-1 at PageID.1481–82; 10-5 at PageID.1422.

Defendants without prejudice because their summons expired. *See* ECF No. 24 at PageID.1600 (citing Mich. Ct. R. 2.102(E)(1)). But "HPIL" filed a second complaint, under a different case caption, against these dismissed Defendants, and one additional Defendant. *See HPIL Holding, Inc. v. Brown*, Case No. 1:24-cv-10479 (E.D. Mich. Feb. 26, 2024). After "HPIL" served all Defendants in that case, this Court consolidated it with the above-captioned case. ECF No. 49. And, in May 2024, this Court granted three Defendants' joint motion to dismiss for failure to state a claim. *HPIL Holding, Inc. v. Zhang*, 734 F. Supp. 3d 664 (E.D. Mich. 2024).

The remaining claims against the remaining Defendants are best considered in two parts. On the front end, "HPIL" alleges that (1) Zhang, (2) Collette, and (3) Brown orchestrated a scheme to "hijack" the Company by fraudulently initiating and influencing the Midland Receivership Proceedings. *See generally* ECF No. 4. On the back end, once Collette was appointed receiver and Brown was appointed CEO, "HPIL" alleges Brown, three of his Canadian companies— (4) Brown Family Investments, Ltd. (BFI); (5) Crank Media, Inc. (Crank); and (6) Criteria Management, Ltd. (Criteria)—and two of his business associates—(7) David Postula and (8) Tanya Larizza— orchestrated an illegal "pump and dump" scheme to artificially inflate the price of HPIL shares through a series of "toxic investments" and fraudulent misrepresentations. *See HPIL Holding*, 734 F. Supp. at 679 ("Plaintiff's Complaint is heavy on the "pump" but light on the "dump." Despite alleging th[at] specific fraudulent statements artificially inflated the value of HPIL stock and induced investments, it is unclear from Plaintiff's Complaint *how* Brown or the other Defendants profited from this alleged fraudulent scheme or otherwise "dumped" their inflated shares." (emphasis in original)). After the dust of initial dismissals and consolidation settled, "HPIL's" current claims are summarized in the following table:

| Count | Claim | Defendants |
|---|---|---|
| I | Malicious Prosecution, MICH. COMP. LAWS § 600.2907 | Zhang, Collette |
| II | Abuse of Process (Michigan Law) | Zhang, Collette |
| III | Abuse of Process (Nevada Law) | Zhang, Collette |
| IV | Breach of Corporate Duties, MICH. COMP. LAWS § 450.1541a | Zhang, Collette |
| V | Conversion / Embezzlement, MICH. COMP. LAWS § 600.2919a | All |
| VI | Breach of Fiduciary Duties / Self-Dealing | Zhang, Collette, Brown, Postula, Larizza |
| VII | Civil Conspiracy | All |
| VIII | RICO, 18 U.S.C. § 1962(c) | All |
| IX | "Claim and Delivery" | Brown |

*Compare* ECF No. 4 *with HPIL Holding*, Case No. 1:24-cv-10479 ECF No. 1.[8]

But an immediately apparent threshold issue must be addressed before the merits of Plaintiff's claims. At an April 2024 status conference, Plaintiff's Counsel Daniel Lehman stated, on the record, that Christopher Philbrick is the individual who authorized this lawsuit in HPIL's name. ECF No. 27 at PageID.1627. But, as this Court noted "the record evidence . . . suggests Philbrick does not possess this authority" because the Midland Circuit Court concluded "that Philbrick was not a continuous HPIL shareholder" throughout the Receivership Proceedings and, accordingly, "could not pursue a derivative claim involving largely the same facts as [alleged] here." *HPIL Holding*, 734 F. Supp. 3d at 700 (E.D. Mich. 2024). Indeed, this Court noted that "Judge Carras did not undo any of Collette's actions in the year she served as HPIL's receiver— including the appointment of Brown as HPIL's CEO and President. Importantly, on April 28, 2023, after the receivership complaint was dismissed—and after Plaintiff alleges Philbrick was

---

[8] The counts of the consolidated complaint have been renumbered for clarity. Although "HPIL" pleaded additional counts seeking "declaratory judgment," "injunctive relief," and "disgorgement" in the companion case (24-10479), this Court already dismissed these claims as pleaded in the above-captioned case, explaining all are "equitable remedies, not distinct causes of action." *HPIL Holding*, 734 F. Supp. 3d at 689 (collecting cases).

appointed HPIL's sole director—Judge Carras denied Philbrick and the other intervenors' request for an injunction and specifically stated that HPIL 'ha[d] been operating under Mr. Brown's apparent authority . . . two years.'" *Id.* (citing ECF No. 10-4 at PageID.1404–05) (emphasis in original). So, this Court noted, it "seems unlikely that the present suit is a proper direct suit" by HPIL, and directed Plaintiff to file supplemental briefing clarifying Philbrick's "capacity to authorize [its] legal action." *Id.*

"HPIL's" supplemental brief provided little clarity. *See generally*, ECF No. 33. Half of the brief recites the facts as this Court already explained them in a published opinion, and the other half regurgitates rejected arguments Philbrick raised in state court. *See id.* at PageID.1810–14. "HPIL" provided Christopher Philbrick's self-serving affidavit averring that, on October 17, 2022, he was appointed to serve as HPIL's CEO by Nitin Amersey and John Mitchell, who, Plaintiff maintains, were HPIL's only directors at the time. ECF No. 33-1 at PageID.1818. And Plaintiff provided an SEC Form 8-K, ECF No. 33-1 at PageID.1821, and an internal corporate memo, ECF No. 33-2 at PageID.1823, reflecting this purported appointment. But here's the problem: Unless the Midland Receivership Proceedings are invalidated, Amersey and Mitchell were *not* HPIL officers or directors in October 2022. Stephen Brown and David Postula were. *See, e.g.*, HPIL Holding Inc., OTC Markets Quarterly Report (Feb. 22, 2022) (identifying HPIL's officers as CEO Brown and President Postula); HPIL Holding Inc., Wyoming Sec. of State Annual Report (Oct. 24, 2022) (identifying Stephen Brown and David Postula as HPIL's officers).

Picking up on this problem, Defendants Zhang and Collette filed a joint motion for judgment on the pleadings, arguing "HPIL's" Complaint should be dismissed, in part because Philbrick does not have the capacity to authorize this direct lawsuit in its name. ECF No. 44 at PageID.2162–66. Defendant Brown seeks dismissal too, and argues this Court does not have

personal jurisdiction over him. *See* ECF No. 51. As explained below, Plaintiff's Complaint must be dismissed, but not for any reason identified by the Parties.

## II.

"[F]ederal courts have a duty to consider their subject matter jurisdiction in regard to every case and may raise the issue *sua sponte*." *Answers in Genesis of Kentucky, Inc. v. Creation Ministries Int'l, Ltd.*, 556 F.3d 459, 465 (6th Cir.2009) (emphasis in original); *see also Thornton v. Southwest Detroit Hosp.*, 895 F.2d 1131, 1133 (6th Cir.1990) (noting "subject matter jurisdiction may be raised sua sponte at any juncture because a federal court lacks the authority to hear a case without" it). Here, Philbrick purports to pursue claims on HPIL's behalf as its sole director and CEO. The Midland Circuit Court rejected his attempts to do so in state court, and concluded he was not HPIL's CEO, and was not even a continuous shareholder throughout the receivership proceedings. Because Philbrick's federal claims necessarily require the review and rejection of these state court judgments, the *Rooker-Feldman* doctrine deprives this Court of subject matter jurisdiction.

The *Rooker-Feldman* doctrine stems from a negative inference buried in 28 U.S.C. § 1257. *RLR Invs., LLC v. City of Pigeon Forge, Tennessee*, 4 F.4th 380, 385 (6th Cir. 2021). That statute vests only the United States Supreme Court with appellate jurisdiction to review state court judgments. Under its negative inference, "lower federal courts" lack subject matter jurisdiction to consider state-court appeals. *Lance v. Dennis*, 546 U.S. 459, 463 (2006). To understand the *Rooker-Feldman* doctrine's "somewhat troubled history," it is best to begin with the two "canonical cases" from which the doctrine derives its name. *RLR*, 4 F.4th at 385

Over 100 years ago, the Supreme Court decided *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). There, appellants were dissatisfied with an Indiana state-court judgment and turned to

federal court, seeking an order that the state court judgment was "rendered . . . in contravention" of the federal Fourteenth Amendment and contract clause. *Id.* at 415. But the federal district court concluded it did not have subject matter jurisdiction to consider the appellant's claims, and the Supreme Court affirmed on direct appeal. *Id.* The Supreme Court held that "[i]f the constitutional questions stated in the [judgment] actually arose . . . , it was the province and duty of the state courts to decide them[.]" *Id.* "If the decision was wrong, that did not make the judgment void, but merely left it open to reversal or modification in an appropriate and timely appellate proceeding."[9] *Id.*

Sixty years after *Rooker*, the Supreme Court decided *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983). The two *Feldman* plaintiffs petitioned the District of Columbia Court of Appeals to waive a rule that required D.C. bar applicants to have graduated from an ABA-approved law school. *Id.* at 465–68, 470–72. After the state court denied their petitions, the two turned to federal court and argued the D.C. court's denial violated the Fifth Amendment. *Id.* at 468, 472. The United States District Court dismissed the federal complaints, concluding it lacked subject matter jurisdiction. *Id.* at 469, 473. But the District of Columbia Circuit reversed, concluding the state court's bar association waiver procedures were not "judicial" and thus "did not foreclose litigation of the [plaintiff's] constitutional contentions" in federal court. *Id.* at 474. The Supreme Court reversed again on appeal, concluding the D.C. state court acted "judicially" throughout the waiver proceedings. *Id.* at 482. The Court distinguished between federal review of the constitutionality of

---

[9] In *Rooker*, the Supreme Court implied that a federal district court *may* have jurisdiction to review a state court judgment issued without jurisdiction. *Rooker v. Fid. Tr. Co.,* 263 U.S. 413, 416 (1923) (noting such decisions are "absolutely void"). Here, although the Midland Circuit Court dismissed the initial *receivership complaint* for lack of proper service and personal jurisdiction, this is *not* the judgment implicated in reviewing Philbrick's federal claims. Instead, Philbrick's federal claims require review and rejection of the Midland Circuit Court's dismissal of his *derivative counterclaim*, which was properly decided within that court's jurisdiction.

the D.C. bar association's *rule* about accredited law graduates, on one hand, and reviewing the D.C. courts' *application* of that rule in particular cases, on the other. Although the former is permissible, federal courts lack jurisdiction to consider the latter under § 1257. *Id.* at 486.

*Rooker* and *Feldman* are "the easy cases" and "outline the basic rule" that "appeals from state courts of last resort go only to the Supreme Court." *RLR*, 4 F.4th at 385. But lower courts across the country and the Sixth Circuit "expanded" this rule in "harder cases" by relying on *Feldman*'s principle that they "possess no power whatever to sit in direct review of state court decisions," 460 U.S. at 482, n. 16. *RLR*, 4 F.4th at 385 (collecting cases). But this expansion lacked uniformity. Although courts agreed *Rooker-Feldman* "prevented a 'de facto appeal from a state court judgment' in federal court," courts could not agree on what constitutes this "'forbidden de facto appeal.'" *Id.* (quoting *Kougasian v. TMSL, Inc*., 359 F.3d 1136, 1139 (9th Cir. 2004)); *see also Feldman*, 460 U.S. at 482, n. 16 (noting *Rooker-Feldman* doctrine bars relitigation of claims raised in state court proceedings as well as those that are "inextricably intertwined" with claims asserted there)

In 2003, the Sixth Circuit joined the majority of federal circuit courts at the time and clarified that the *Rooker-Feldman* doctrine also dissolves federal jurisdiction when a plaintiff seeks federal review of state interlocutory orders or orders of lower state trial courts. *Pieper v. Am. Arb. Ass'n, Inc*., 336 F.3d 458, 462–65 (6th Cir. 2003). The Sixth Circuit found "it difficult to believe that lower federal courts are prohibited from reviewing final state-court judgments, but yet are somehow permitted to review interlocutory decisions." *Id.* at 462 (collecting cases) (citing *Richardson v. District of Columbia Court of Appeals*, 83 F.3d 1513, 1515 (D.C. Cir. 1996)). And, "[f]or similar reasons," the Sixth Circuit held that lower courts cannot logically be "prohibited from reviewing judgments of a state's highest court but . . . somehow . . . free rein to review the

judgments of lower state courts." *Id.* at 463 ("The Supreme Court has repeatedly used language suggesting that *Rooker-Feldman*'s bar applies to judgments of lower state courts as well as to those of a state's highest court."); *see also RLR*, 4 F.4th at 386 ("The logic was obvious. If lower courts can't review the final product of state-court litigation, why should a lower court entertain an interlocutory appeal so long as a state court hasn't yet come to a conclusion?").

Two years later, the Supreme Court clarified that *Rooker-Feldman* does not apply in *parallel* state and federal proceedings. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 293 (2005). In cases involving "properly invoked concurrent jurisdiction," federal jurisdiction does not "vanish[]" when the state court "reaches judgment on the same or related question[.]" *Id.* Instead, the Supreme Court held that the *Rooker-Feldman* doctrine is "confined to cases [(1)] brought by state-court losers[, (2)] complaining of injuries caused by state-court judgments[, (3)] rendered *before* the district court proceedings commenced[,] and [(4)] inviting district court review and rejection of those judgments." *Id.* at 284 (emphasis added). The Sixth Circuit recently clarified that these four prongs provide the "starting point" of any *Rooker-Feldman* analysis, and that the "key words are 'review' and 'judgment.'" *RLR*, 4 F.4th at 387 (citing *VanderKodde v. Mary Jane M. Elliott, P.C.*, 951 F.3d 397, 406 (Sutton, J., concurring)).

### III.

Each of the four necessary *Rooker-Feldman* conditions will be considered in turn, followed by a brief discussion concerning the inapplicability of an exception for alleged extrinsic fraud.

### A. "State-Court Loser"

To analyze whether the *Rooker-Feldman* doctrine applies, the Court first asks whether the federal case is pursued by what the Supreme Court calls a "state-court loser[]." *Exxon*, 544 U.S. at 284. This condition is satisfied here. Christopher Philbrick—along with Ray Wong and Frank

Dougherty—filed a derivative counterclaim in Midland Circuit Court *after* Judge Carras dismissed the receivership complaint for improper service, alleging that Defendants Zhang, Collette, and Brown defrauded the state court throughout the receivership proceedings. *See supra* Section I.B.3. The Midland Circuit Court dismissed all counterclaims because Philbrick and the other intervenors could not establish they were continuous HPIL shareholders and, even if they could, did not file a written demand on HPIL's board of directors. *See id.* Although the operative Complaint lists "HPIL" as the Plaintiff, Plaintiff's Counsel conceded on the record that Christopher Philbrick is "at the helm" and "authorized the instant suit in HPIL's name." *HPIL*, 734 F. Supp. 3d at 671; *see also* ECF No. 27 at PageID.1627.

## B. State Court Judgments

The Court next considers whether the dismissals of Philbrick's state-court derivative counterclaims "count as . . . judgment[s]." *RLR*, 4 F.4th at 387. This inquiry is "straightforward." *Id.* at 389. "For the purposes of *Rooker-Feldman*, the Supreme Court has defined 'judgment' under § 1257 to be an 'investigation, declaration, and enforcement of liabilities as they stood on present or past facts and under laws supposed already to exist.'" *Id.* (quoting *Feldman*, 460 U.S. at 479) (cleaned up). On-the-merits determinations plainly classify as "judgments," while "ministerial actions" do not. *Id.*

Here, the relevant state-court derivative counterclaim dismissals lie somewhere on the spectrum between these ends. True, Judge Carras did not reach the "merits" of Philbrick's legal claims that Zhang, Collette, and Brown defrauded the state court and HPIL shareholders. *See supra* Section I.B.3. Instead, Judge Carras concluded Philbrick lacked standing and did not comply with the procedural requirements to initiate, let alone maintain, *any* derivative counterclaim on HPIL's behalf. *See supra* Section I.B.3. In so doing, Judge Carras expressly rejected Philbrick's

contentions that (1) he was a continuous HPIL shareholder, and (2) he was appointed as HPIL's CEO and sole director, so he need not comply with demand requirements applicable to other shareholders. *See id.* Far from ministerial, this holding and determination resulted from an in-depth factual investigation. *See, e.g.*, *Van Hoven v. Buckles & Buckles, P.L.C.*, 947 F.3d 889, 892 (6th Cir. 2020) (finding state-court "writ of garnishment" was ministerial and not a "judgment" for *Rooker-Feldman* purposes because any creditor could "obtain one simply by filing a form with the court clerk," who, under Michigan law, issues the writ so long as it "appears to be correct").

And it matters not that Philbrick and the other intervenors sought reconsideration of this "judgment." As discussed, Philbrick and the other intervenors filed a motion for reconsideration on July 7, 2023, and it is unclear whether this motion was timely. *See supra* Section I.B.3. Even if the motion was timely such that federal review of the Midland Circuit Court's derivative counterclaim dismissal could be classified as "interlocutory," the Sixth Circuit has repeatedly recognized that *Rooker-Feldman* still precludes federal jurisdiction. *RLR*, 4 F.4th at 387; *Pieper*, 336 F.3d at 462. For the same reasons, Philbrick does not avoid *Rooker-Feldman* simply because the Midland Circuit Court is not Michigan's highest court. *Pieper*, 336 F.3d at 463 (noting the "*Rooker–Feldman* doctrine applies equally to orders of lower [state] courts"). The underlying Midland Circuit Court opinions are "judgments" for *Rooker-Feldman* purposes.

## C. Timing

The next question this Court considers is whether the Midland Circuit Court dismissed Philbrick's derivative counterclaims *before* Philbrick—purporting to act on HPIL's behalf—filed his federal complaint. *See RLR*, 4 F.4th at 387 (citing *Exxon*, 544 U.S. at 284). A quick comparison between the federal and state proceedings provides the answer. Judge Carras dismissed Philbrick, Wong, and Dougherty's derivative counterclaims in Midland Circuit Court against Zhang and

Collette on April 28, 2023. *See* ECF No. 14-1 at PageID.1461–89. And, for the same reasons, Judge Carras dismissed the intervenors' derivative counterclaims against Brown on June 15, 2023. *See* ECF No. 10-5 at PageID.1412–29. "HPIL" did not file a federal complaint until two months later, on August 13, 2023. *See* ECF No. 1. This *Rooker-Feldman* condition is satisfied.

### D. Source of Alleged Injuries

Finally, the Court considers whether Plaintiff seeks federal review of an injury *caused* by the Midland Circuit Court judgments. *Exonn*, 544 U.S. at 284. Sometimes, the source of an alleged injury is easy to uncover. If, for example, a plaintiff explicitly seeks injunctive or declaratory relief, asking a federal court to overturn or invalidate a state-court judgment, *Rooker-Feldman* likely applies. *See RLR*, 4 F.4th at 388 ("By asking a federal court to declare a state court order unconstitutional and prevent its enforcement, [the plaintiff] impermissibly appealed the state court's order to the federal district court.") But, absent this rare explicit ask, pinpointing the precise source of a federal plaintiff's injury may be more "complicated." *Id.* at 387–88. Federal courts must look to the often implicit allegations of the complaint, and must distinguish alleged injuries attributable to earlier state-court judgments, on one hand, and those attributable to the independent actions of third parties, on the other. *Rooker-Feldman* applies to the former but not the latter. *McCormick v. Braverman*, 451 F.3d 382, 393 (6th Cir. 2006); *VanderKodde*, 951 F.3d at 402. Here, the inquiry is straightforward. Based on Plaintiff's explicit requests for relief and implicit factual and legal allegations, it seeks review and rejection of the Midland Circuit Court's judgments.

Start with Plaintiff's explicit requests for relief. "HPIL" seeks a "declaration" that "void[s]" "any document granting" Stephen Brown the authority to act on HPIL's behalf. ECF No. 4 at PageID.763. Although Brown became HPIL's CEO under a nonjudicial Reorganization

- 26 -

Agreement with Angela Collette, *see supra* Section I.B.2., this Agreement cannot be untethered from the Midland Circuit Court's order appointing Collette to serve as HPIL's receiver. In this way, Plaintiff asks this Court to invalidate a state-court decision, albeit one the state-court later reversed. *See* ECF Nos. 4-27; 10-1 at PageID.1197; 37-5 at PageID.2070.

Notably, Philbrick sought this relief in Midland Circuit Court, first. *See* ECF No. 14-1 at PageID.1474 ("Mr. Brown was not the CEO [and] is not the CEO."), PageID.1477 ("Mr. Brown was not the CEO. Mr. Brown has done nothing but steal from. . . HPIL. . . . Mr. Philbrick's been appointed to be the[] CEO[.]"). But the Midland Circuit Court squarely rejected this relief, on two separate occasions. ECF Nos. 37-5 (denying injunctive relief in October 2022 because Philbrick's pleadings were "[im]proper"); 14-1 at PageID.1487 (denying injunctive relief in April 2023 because Philbrick and his fellow intervenors never "request[ed] a change in who was in charge of HPIL" when the receivership was dismissed, and "the business ha[d] been operating under Mr. Brown's apparent authority" in the two years since). *Rooker-Feldman* prohibits Philbrick from taking a second bite of the apple in federal court. *See Rooker*, 263 U.S. at 415 ("If the [state-court's] decision was wrong, [it is] open to reversal or modification in an appropriate and timely [state] appellate proceeding."); *Hood v. Keller*, 341 F.3d 593, 597 (6th Cir. 2003) (noting the "purpose of the doctrine" is to prevent "a party losing in state court . . . from seeking what in substance would be appellate review of the state judgment in" federal court (internal quotations omitted)).

Aside from this explicit requested relief, there can be no dispute that "HPIL" implicitly complains of injuries *caused* by the Midland Circuit Court's judgments. The operative complaint lists HPIL as the Plaintiff. ECF No. 4 at PageID.724. But, unless its "articles of incorporation provide otherwise," a corporation can only file a lawsuit in its own name if the suit is first approved

or authorized by its directors. *See* WYO. STAT. ANN. §§ 17-16-801(b); 17-16-302(a)(i) (2024); *see also Santa Clara Cnty. v. S. Pac. R. Co*., 118 U.S. 394 (1886) (recognizing artificial corporate "person[hood]"). HPIL's Articles of Incorporation do not modify this bedrock principle. *See* ECF No. 4-2 at PageID.792–97. Christopher Philbrick is the individual who authorized this lawsuit in HPIL's name. ECF No. 27 at PageID.1627. So, for this lawsuit to proceed, Philbrick must be HPIL's sole director. *See* ECF No. 33. Philbrick swears he is. *See* ECF No. 33-1 at PageD.1818. But the Midland Circuit Court necessarily and expressly held otherwise when it dismissed Philbrick's shareholder derivative claims, concluding he was not HPIL's CEO, was not a continuous HPIL shareholder, and did not file a demand with *CEO Stephen Brown* or any other actual HPIL director. ECF No. 14-1 at PageID.1477–83, 1487–88. Because "HPIL" "would only prevail on its . . . claims . . . if the state court were wrong," the Midland Circuit Court's orders are the true source of Plaintiff's injuries. *RLR*, 4 F.4th at 388; *see also Tubbs v. Long*, No. 22-5127, 2022 WL 13983800, at *5 (6th Cir. Oct. 24, 2022) (finding source of plaintiff's injury was the underlying state-court judgments and applying *Rooker-Feldman* because plaintiff could only succeed on his federal claims if the federal court "overturn[ed]" the state court's earlier ruling).

On this point, it matters not that Plaintiff pursues RICO and other claims for the first time in this federal case. "The test is whether the plaintiff's injury *stems* from the state-court judgment, not whether the claims are identical." *Id.* (emphasis added); *see also Pieper*, 336 F.3d at 461 (applying *Rooker-Feldman* even though "none" of the federal claims were "actually raised" in state court). Because Philbrick—purporting to pursue claims on HPIL's behalf—asks for the type of review *Rooker-Feldman* forbids, this Court lacks subject matter jurisdiction.

### E. Extrinsic Fraud Exception

Before concluding, it is worth pausing to highlight why one rare exception to *Rooker-Feldman* does not apply. The Ninth Circuit has held that an exception to *Rooker-Feldman* applies to state court judgments that the federal plaintiff alleges were obtained "through extrinsic fraud." *Kougasian v. TMSL, Inc*., 359 F.3d 1136, 1140–41 (9th Cir. 2004) (reasoning that "[a] plaintiff alleging extrinsic fraud on a state court is not alleging a legal error by the state court; rather, he or she is alleging a wrongful act by the adverse party"). The Sixth Circuit alluded to this "extrinsic fraud" exception in an unpublished 2022 opinion, but held there that an *exception to the exception* applies when the federal plaintiff litigated the alleged fraudulent conduct in state court, first. *Minix v. Stone*, No. 21-5489, 2022 WL 3031259, at *2 (6th Cir. Feb. 7, 2022) (noting federal plaintiffs "cannot circumvent the restraints of *Rooker-Feldman* by raising fraud claims [in federal court] that were raised and rejected in the state-court proceedings"); *see also Wyatt v. Safeguard Mgmt. Properties, LLC*, No. 16-13312, 2017 WL 4841905, at *3 (E.D. Mich. Oct. 26, 2017) (holding *Rooker-Feldman* precluded jurisdiction of extrinsic fraud claims because the federal plaintiff already "raised th[e] issue" in the underlying state court proceedings).

Here, although Philbrick argues the Midland Receivership Proceedings were riddled with Zhang, Collette, and Brown's fraud, Philbrick already raised this argument in state court. *Compare* ECF No. 4 at PageID.727 (alleging receivership was "procured via fraudulent and impermissible means" and Zhang and Collette's misrepresentations) *with* ECF No. 14-1 at PageID.1462–63, 1468–69, 1472 (noting Philbrick's state derivative counterclaim primarily alleged that the receivership was procured via "fraudulent abuse of process" including Zhang And Collette's misrepresentations). Indeed, this alleged fraud was at the core of Philbrick and his fellow intervenors' counterclaims, which the Midland Circuit Court dismissed as improper and

unwarranted. *See supra* Section I.B.3. So the "extrinsic fraud" exception does not apply, and *Rooker-Feldman* deprives this Court of subject matter jurisdiction to consider Philbrick's "de facto" state appeal.

Accordingly, Plaintiff's Amended Complaint, ECF No. 4, will be dismissed with prejudice. Defendant Zhang and Collette's joint Motion for Judgment on the Pleadings, ECF No. 44, and Defendant Brown's Motion to Dismiss, ECF No. 51, will be denied as moot.

**IV.**

Accordingly, it is **ORDERED** that Plaintiff's Amended Complaint, ECF No. 4, is **DISMISSED WITH PREJUDICE.**

Further, it is **ORDERED** that Defendant Haining Zhang and Angela Collette's joint Motion for Judgment on the Pleadings, ECF No. 44, is **DENIED AS MOOT.**

Further, it is **ORDERED** that Defendant Stephen Brown's Motion to Dismiss, ECF No. 51, is **DENIED AS MOOT.**

**This is a final order and closes the above-captioned case.**

Dated: March 31, 2025          s/Thomas L. Ludington
                               THOMAS L. LUDINGTON
                               United States District Judge